## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. RWT-07-0199 |
| | : | |
| EARL WHITTLEY DAVIS, | : | |
| a/k/a Baby Earl, and "E" , | : | |
| | : | |
| Defendant. | : | |
| | : | |

### MEMORANDUM OPINION

### PART 1: INTRODUCTION

The defendant, Earl Whittley Davis, has been indicted for a number of federal crimes relating to the robbery and murder of Jason Schwindler on August 4, 2004. The charge of murder by use of a firearm in furtherance of a Hobbs Act robbery in violation of 18 U.S.C. § 924(j) is a death-eligible offense. On April 8, 2008, the government filed formal notice of its intent to seek the death penalty.

The Federal Death Penalty Act, enacted in 1988, provides that a "sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). Fourteen years later, the federal policy embodied in the Act became a constitutional imperative when, in *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that execution of a mentally retarded defendant would constitute a "cruel and unusual punishment" prohibited by the Eighth Amendment.

Mental retardation is not a defense, nor is the lack of mental retardation an element of a crime that the government must prove beyond a reasonable doubt in order to impose the death penalty. *See Walker v. True*, 399 F.3d 315, 326 (4th Cir. 2005). Rather, it is a condition, the existence of which disqualifies a person from capital punishment, but certainly not all punishment, including life in prison. *See Atkins*, 536 U.S. at 306 ("Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes.").

In December 2008, the defendant filed a motion requesting a pretrial hearing on the question of whether imposition of the death penalty in this case should be barred because he is

-1-

mentally retarded. The defense argued that it is both efficient and practical for a trial judge to determine whether a capital defendant is mentally retarded prior to trial, due to the significant amounts of time, money, and effort that could be saved by eliminating an unnecessary penalty-phase proceeding. The government disagreed, and urged the Court to address the mental retardation issue during the sentencing proceeding in order to avoid duplicative presentation of evidence relevant to both mental retardation and mitigation, and so that there would be only one appeal and no delay in the start of trial.

The Court concluded that the defendant's arguments were more sound, and consistent with every other federal court that had addressed the issue. Consequently, because mental retardation is a disqualifying condition, the Court granted the defendant's motion and assigned to him the burden of establishing, by a preponderance of the evidence, that he is mentally retarded. *See United States v. Hardy*, 2008 WL 1742490 (E.D. La. Apr. 10, 2008)(finding that question of mental retardation should be resolved by the judge at a pretrial hearing, and burden should be on defendant by preponderance of the evidence); *United States v. Nelson*, 419 F. Supp. 2d 891 (E.D. La. 2006)(same); *United States v. Sablan*, 461 F. Supp. 2d 1239 (D. Colo. 2006) (same).

After the experts retained by each party had an opportunity to evaluate the defendant and prepare reports for the Court, the hearing on the issue of mental retardation began on March 24, 2009. The hearing lasted six days, during which the Court heard extensive expert and fact testimony that is summarized and discussed below. For the reasons explained in this opinion, the Court concludes that the defendant has abundantly satisfied his burden of proving his mental retardation by a preponderance of the evidence and, accordingly, the government will not be permitted to seek a sentence of death.

## I. Mental Retardation – A Primer For Capital Cases

In *Atkins*, the Supreme Court noted that "to the extent there is a serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317. The Court then left to the states the task of developing standards and appropriate ways to enforce the

constitutional prohibition. *Id.*

The *Atkins* court cited two professional organizations for their definitions of mental retardation–the American Association On Mental Retardation (AAMR), and the American Psychiatric Association–and noted that their definitions were "similar." *Id.* at 308 n.3. Since *Atkins*, other federal courts have applied these same definitions, noting that the two definitions are essentially identical.

The definition of mental retardation is effectively three-pronged. An individual must have (1) significantly below average intellectual functioning, (2) significant deficits in adaptive behavioral skills, and (3) onset of the condition before age eighteen.


A. Definitions of Mental Retardation

The AAMR[1] is an organization of professionals and citizens concerned about intellectual and developmental disabilities. Its mission is to "promote[ ] progressive policies, sound research, effective practices and universal human rights for people with intellectual and developmental disabilities." American Association On In tellectual and Developmental Disabilities, Mission Statement, http://www.aamr.org/content_443.cfm?navID=129 (last visited April 14, 2009). The AAMR defined mental retardation in its 2002 manual as follows:

> Mental retardation is a disability characterized by significant limitations in both intellectual functioning and in adaptive behavior, as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

AAMR, Mental Retardation: Definition, Classification, and Systems of Support 8 (10th ed. 2002) (hereinafter, "AAMR 2002" or "AAMR manual").

A "significant" limitation in intellectual functioning is best represented by an IQ score that

---

[1] The AAMR is now known as the American Association On Intellectual and Developmental Disabilities (AAIDD). The Court will continue to use the older acronym throughout this opinion because that was the organization's name when the manual, Mental Retardation: Definition, Classification and Systems of Support, was published in 2002. The supplement to the 2002 manual, the User's Guide: Mental Retardation: Definition, Classification and Systems of Support, was published in 2007 under the organization's new title, AAIDD, but to avoid reader confusion, this opinion will attribute both publications to the AAMR.

is approximately two standard deviations below the mean as measured by appropriate instruments, and in consideration of the standard error of measurement (SEM). *Id* at 14, 37. Most standardized IQ assessment tests are normalized so that the average score is 100 with a standard deviation of 15. Therefore, an IQ score two standard deviations below the mean—the benchmark for mental retardation—is approximately 70. However, the SEM in IQ assessments is approximately 5 points, therefore raising the operational definition of mental retardation to 75. AAMR 2002 at 58-59; American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41-42 (4th ed., text rev. 2000) (hereinafter, DSM-IV-TR) ("it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior").

The operational definition of a "significant" limitation in adaptive behavior requires performance of at least two standard deviations below the mean of either (a) *one* of the following three types of adaptive skills: conceptual, social, and practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills. AAMR 2002 at 76.

The AAMR manual also specified five additional assumptions that should be included as part of the application of the definition of mental retardation. One of these assumptions is particularly salient in the context of this case:

> *Assumption 3: "Within an individual, limitations often coexist with strengths."* This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.

AAMR 2002 at 8.

The American Psychiatric Association's definition of mental retardation is similar:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, heath and safety (Criterion B). The onset must occur before age 18 (Criterion C).

DSM-IV-TR at 41.  All experts who testified in this case agreed that the two definitions are essentially the same, and both are recognized as authoritative.

The DSM-IV-TR states that four approximate levels of severity of mental retardation can be specified, reflecting the level of intellectual impairment.  Individuals with mild mental retardation (MMR) have IQs in the range of 50-55 to approximately 70, and represent about 85% of all individuals with the disability.  Individuals with IQs of 35-40 to 50-55 are considered to have moderate mental retardation; IQs of 20-25 to 35-40 are indicative of severe mental retardation; and IQs below 20-25 are indicative of profound mental retardation. See DSM-IV-TR at 42-43.

C. Developmental Nature of Mental Retardation

Mental retardation (MR) is characterized as a *developmental* disability because persons with mental retardation do not acquire skills during the developmental period (i.e., birth to age 18) at the same rate as those without it.  This is why onset before age 18 is one of the diagnostic criteria.  One expert[2] explained that someone who exhibited subaverage intellectual functioning and adaptive deficits that would otherwise be associated with mental retardation, but in fact were caused by an event or trauma suffered during his or her adult life, would not be classified as mentally retarded, but rather as "demented," because that type of disability is not developmental in nature.

D. Difficulties Inherent In the Assessment of Capital Defendants

In most non-forensic circumstances, evaluations to determine whether an individual is mentally retarded focus on the individual's present level of functioning.  However, in the case of a capital defendant who is being assessed as part of a sentencing eligibility determination, a retrospective diagnosis is often required because the defendant usually did not receive a diagnosis of mental retardation during the developmental period. In addition, a number of criminal defendants fall at the upper end of the MR severity continuum (i.e., have a higher IQ than many others with mental retardation), and frequently present a mixed competence profile. AAMR, User's Guide:

---

[2] Bruce K. Shapiro, M.D.

<u>Mental Retardation: Definition, Classification, and Systems of Support</u> 18 (10th ed. 2002) (2007) (hereinafter, <u>User's Guide</u>).

The <u>User's Guide</u> presents a series of guidelines for clinicians charged with making these retrospective diagnoses, in which the ability to conduct a standard assessment is "less than optimal," such as when a defendant has been incarcerated for a number of years prior to his or her evaluation. These guidelines advise clinicians to: (1) conduct a thorough social history; (2) conduct a thorough review of school records; (3) assess adaptive behavior using multiple informants and multiple contexts; (4) recognize the "Flynn effect"[3]; (5) recognize the impact of practice effect; (6) recognize that self-ratings have a high risk of error in determining significant deficits in adaptive behavior, but can be used cautiously in conjunction with multiple informants; (7) conduct a longitudinal evaluation of adaptive behavior; and (8) not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about the presence of mental retardation. *Id.* at 18-22.

## II. Background of the Defendant, Earl Whittley Davis

The defendant grew up in Washington, D.C., and lived with his parents, Shirley and Earl Davis, Sr. The elder Mr. Davis had multiple children by multiple mothers, many of whom lived with him and Mrs. Davis over the last forty years. The defendant's home environment has been described by a number of reporters as chaotic and violent. Don Davis, the defendant's older half-brother, alleged that in the Davis home, children were used as chattels to bring in money. Don Davis and another older brother moved out of the home when they were about 15. There is a documented history of learning difficulties in the family. The defendant's mother, older half-brother, and niece all acknowledged that they attended special education classes when in school.

Davis, now thirty-eight, has a lifelong history of seizures that began when he was approximately ten months old. At age two, he had symptomatic lead poisoning with markedly high blood-lead levels. At age three, he had seizures and vomiting, and tests revealed he still had an elevated blood-lead level. When he was nine, he was diagnosed with partial complex seizure disorder, and that diagnosis was changed to generalized seizure disorder when he was thirteen. His

---

[3] The Flynn effect is discussed *infra*, Part 2.I.B.

seizures manifest as staring or loss of awareness. As a teenager, he reportedly had at least two bike accidents in which he was struck by vehicles, one of which resulted in a blow to the head and loss of consciousness.

When the defendant was eight and in the third grade, concerns were expressed about his subpar academic performance, and he was given the Peabody Individual Achievement Test (PIAT). The results showed that his proficiency in math, reading, and spelling were at early first grade levels. Subsequently, he received tutoring in reading and writing at the Children's Hospital in Washington, D.C. twice weekly for approximately two years, but made little progress.

In 1982, when the defendant was twelve, he was given a number of neuropsychological tests, some administered at his school, and some at Children's National Medical Center. Gov. Ex. 1, Report of Dr. Ida Baron (hereinafter, Baron Rep.) On the Wechsler Intelligence Scale for Children (WISC), his full scale IQ was 75, which placed him in the borderline range of intellectual functioning. On other neuropsychological measures, he was found to have difficulty with cognitive flexibility, psychomotor problem solving, ability to perceive speech sounds, and immediate auditory recall. These test results were interpreted as indicative of a chronic, long-standing, diffuse impairment of cognitive functioning.

The defendant was retained in the fifth grade, and at the end of his second fifth grade year, he was found eligible for special education services. He remained in special education from sixth through twelfth grade. In 1987, he attended the Duke Ellington School of the Arts, where one of his goals was to bring his academic abilities up to the second and third grade level. Specific objectives included: "answer multiple choice questions concerning specific facts and the main idea," "follow oral and written direction," "make change for $20.00 using a variety of bills and coins," "solve money word problems including check writing and balancing a check book," and "read a clock, set a clock, and add and subtract given times on a clock." Def. Ex. 1, Report of Dr. George Woods, 8 (hereinafter, Woods Rep.)

While at Duke Ellington, when the defendant was nearly 17, his academic achievement levels were tested again, and on the PIAT he scored a grade-level equivalent of 2.8 in spelling, 2.7 in reading comprehension, and 2.3 for reading word recognition. He left high school when he was 19 or 20 and in the eleventh or twelfth grade, but did not graduate. When he was evaluated for job

placement by the Rehabilitation Services Administration, he wa s found to be disabled and functionally illiterate at age 22.

The defendant has admitted to use of alcohol, PCP, marijuana, and cocaine.

### III. Record of the Defendant's Intellectual Functioning

The defendant has been administered IQ tests four times, at ages 12, 22, 36, and 38. These full-scale IQ scores, before adjustment for the Flynn effect, are 75, 76, 65, and 70, respectively. The Flynn-adjusted scores[4] are 66, 73, 62, and 70, all of which place him well within the range associated with mental retardation. These results are summarized in the following chart:

| Test | Date of Admin. | Davis' Age | Full Scale IQ | Date of Test Publication | Flynn-Adjusted IQ |
|---|---|---|---|---|---|
| Wechsler Intelligence Scale for Children (**WISC**) | 1982 | 12 | 75 | 1949 | 66 |
| Wechsler Adult Intelligence Scale - Revised (**WAIS-R**) | 1992 | 22 | 76 | 1981 | 73 |
| Wechsler Adult Intelligence Scale - III (**WAIS-III**) | 2006 | 36 | 65 | 1997 | 62 |
| Wechsler Adult Intelligence Scale - IV (**WAIS-IV**) | 2009 | 38 | 70 | 2008 | 70 |

### IV. Expert Witnesses

During the hearing, the Court heard opinion testimony from seven experts, the first five for the defense, and the final two for the government. Their qualifications are summarized below.

---

[4] The Flynn effect is discussed in greater detail *infra*, Part 2.I.B.

A. Dr. Joette James, Ph.D

Dr. James is a licenced psychologist and pediatric neuropsychologist. She received her Ph.D. in clinical psychology from Northwestern University Medical School in 2003. Since 2006, Dr. James has held a faculty position within the Pediatric Neuropsychology Program at Children's National Medical Center in Washington, D.C. She is a member of the American Psychological Association (APA) Division 40 – Clinical Neuropsychology,[5] the International Neuorpsychological Society, and the National Academy for Neuropsychology. In her report, Dr. James noted that the review of the defendant's records that she performed was the sort of assessment that she routinely conducts as part of her duties as a clinician at Children's National Medical Center.

B. Dr. Drew Nagele, Psy.D.

Dr. Nagele received his doctor of psychology (Psy.D.) from Central Michigan University in 1982. Currently, he is Director of Rehabilitation at the Children's Hospital of Philadelphia and President of the Board of Directors of the Brain Injury Association of Pennsylvania. He holds a number of teaching positions, including adjunct clinical assistant professorships at LaSalle University and Drexel University, both in Philadelphia. He is also a clinical instructor for the American Academy for the Certification of Brain Injury Specialists, an affiliate of the Brain Injury Association, USA. Among other professional affiliations, Dr. Nagele is a member of APA Division 40 - Clinical Neuropsychology.

C. Dr. John Gregory Olley, Ph.D.

Dr. Olley received a Master's degree in General-Experimental Psychology from Wake Forest University in 1968, and earned his Ph.D. in Clinical Psychology with a related area in Special

---

[5] The American Psychological Association is a broad national organization with a number of divisions focusing on specific practice areas. Division 40, Clinical Neuropsychology, "provides a scientific and professional forum for individuals interested in the study of the relationships between the brain and human behavior. As such, Division 40 promotes interdisciplinary interaction among various interest areas including physiological cognitive, developmental, clinical rehabilitation, school, forensic, and health psychology." APA Online, Division 40 - Clinical Neuropsychology, http://www.apa.org/about/division/div40.html (last visited Apr. 21, 2009).

Education from the George Peabody College for Teachers (now the George Peabody College of Vanderbilt University) in 1973. He is currently a psychologist and clinical scientist at the Center for Development and Learning, and a clinical professor at the Division of Rehabilitation Psychology and Counseling, both at the School of Medicine at the University of North Carolina at Chapel Hill. He is a prolific author with an impressive number of publications to his name. Of particular relevance to this hearing, Dr. Olley has authored a three-part series of articles entitled "The Assessment of Adaptive Behavior In Adult Forensic Cases." He has also published articles on *Atkins*-related issues in the Journal of Forensic Psychology Practice, and has contributed a book chapter concerning the use of the ABAS-II[6] in assessment of adaptive behavior in adult forensic cases.

Dr. Olley is a member of a number of professional organizations, among them APA Division 25 – Behavior Analysis, APA Division 33 – Intellectual and Developmental Disabilities[7] (of which he is the President-Elect), and APA Division 41 – The American Psychology-Law Society.[8] He is also a Fellow and Life Member of the American Association on Intellectual and Developmental Disabilities (formerly AAMR).

D. Dr. Bruce K. Shapiro, M.D.

Dr. Shapiro received his M.D. from Boston University in 1972. Subsequently, he completed a three-year residency in pediatrics at Children's National Medical Center, and then a two-year fellowship in developmental pediatrics at the John F. Kennedy Institute/Johns Hopkins University School of Medicine. He is currently a professor of pediatrics at the Johns Hopkins University School

---

[6] The ABAS-II refers to the Adaptive Behavior Assessment System (2d ed.), which is a standardized assessment measure of adaptive functioning.

[7] According to the APA website, Division 33 "endeavors to advance psychology, based on scientific inquiry and high standards of practice in the treatment of mental retardation and developmental disabilities. . . . Members receive the newsletter Psychology in Mental Retardation and Developmental Disabilities three times per year." APA Online, Division 33 - Intellectual and Developmental Disabilities, http://www.apa.org/about/division/div33.html (last visited Apr. 21, 2009).

[8] For a list of all the APA Divisions, see APA Online, APA Divisions, http://www.apa.org/about/division.html (last visited Apr. 21, 2009).

of Medicine, the director of training programs at the Kennedy Krieger Institute, and a member of the active medical staff at the Kennedy Institute, the Johns Hopkins Hospital, and St. Agnes Hospital. He has published extensively in the fields of developmental pediatrics and child neurology.

E. <u>Dr. George Woods, Jr., M.D.</u>

Dr. Woods received his M.D. from the University of Utah in 1977. He then completed an internship at Highland Hospital in Oakland, CA, and a residency in psychiatry at Pacific Medical Center in San Francisco. His professional affiliations include the American College of Forensic Psychiatry, the American Academy of Psychiatry and Law, the American College of Forensic Examiners, and the International Academy of Law and Mental Health, of which he is the Secretary-General elect. He is currently an adjunct professor at California State University, Sacramento in the department of educational leadership and public policy, and the Morehouse College School of Medicine.

F. <u>Dr. Sue Ellen Antell, Ph.D.</u>

Dr. Antell received her Ph.D. in psychology from the University of Maryland, Baltimore County, in 1983. She completed a post-doctoral fellowship in the department of psychiatry and behavioral science at Johns Hopkins University and in the department of cognitive neuropsychology at the Kennedy Institute for Handicapped Children in 1984. Since 1999, she has been in private practice in both clinical and forensic neuropsychology. She holds a number of specialty board certifications, including diplomate status in the American Board of Professional Neuropsychology and the American Board of Professional Psychology in Clinical Child and Adolescent Psychology. She is a member of APA Division 40 - Neuropsychology, APA Division 41 - Psychology and Law, APA Division 6 - Behavioral Neuroscience, and APA Division 33 - Intellectual and Developmental Disabilities. She has published peer-reviewed articles and delivered professional papers, but most were in or before 1996.

G. <u>Dr. Jack Spector, Ph.D.</u>

Dr. Spector received a master's degree and a Ph.D. in clinical psychology from the University

of Louisville in 1981 and 1984, respectively. He has previously been affiliated with the University of Maryland School of Medicine and Georgetown University School of Medicine as an assistant clinical professor in psychiatry and neurology. Dr. Spector is a member of APA Division 40 - Clinical Neuropsychology, and is board certified by the American Board of Professional Psychology in clinical neuropsychology. He is currently a consulting training director for the pediatric neuropsychology fellowship training program at Children's National Medical Center. He has authored a number of publications and presentations on neuropsychological assessment, with a particular focus on traumatic brain injury. He is not a member of APA Division 33 - Intellectual and Developmental Disabilities, and he testified that his ongoing professional interest in issues related to mental retardation is "primarily limited to the cross diagnoses of Alzheimer's disease and Down's syndrome." Spector Test. 109, March 26, 2009 (hereinafter, Spector Test. Vol. 1)

### PART 2: ANALYSIS

The defendant contended that he has a long-term, well-documented and consistent history of intellectual and adaptive functioning deficits that preceded the age of eighteen, continue at present, and place him well within recognized norms for a diagnosis of mental retardation, thus disqualifying him from eligibility for imposition of the death penalty.

The government disagreed and advanced a number of arguments in support of its contention that despite the defendant's cognitive limitations, he was not mentally retarded. The government experts postulated that (1) the defendant was not giving his full effort on a number of tests in order to artificially deflate his scores; (2) the Flynn effect should not be applied; (3) the difference between the defendant's performance on verbal and non-verbal subtests make the full-scale IQ scores misleading; and (4) the defendant suffered from a cognitive learning disability rather than mental retardation. In addition, the government argued that the defendant does not have any significant deficits in adaptive functioning.

The contentions of the parties are discussed below.

## I. Intellectual Functioning

A. Davis' Academic Deficits Are Not Solely Attributable To A Learning Disability

The government's overarching contention with regard to the intellectual functioning prong of the mental retardation definition is that the defendant suffers from a cognitive disorder and/or learning disability that accounts for his academic deficits and some of his adaptive deficits, but that he is not mentally retarded.

Dr. Spector based this conclusion on the defendant's past academic scores, his own testing, "previous evaluations of more trustworthy validity than the one done by Drs. Donner and Nagele," and because "that appears to be how he was treated when he was in school." Spector Test. Vol. 1, 54-55.

Dr. Antell took the position that "in order to make a diagnosis of mental retardation, one must first **exclude** other factors which might impact on IQ test or adaptive performance including (but not limited to) psychiatrics [sic] illness, social or cultural factors which might bias testing, *disorders of learning or communication*, or sensory impairments." Gov. Ex. 22, Report of Dr. Antell, 2-3 (bold in original, italics added) (hereinafter, Antell Rep.)  Dr. Antell opined that any deficits in Davis' adaptive behavior are traceable to a learning disability, the existence of which, in her opinion, would preclude a diagnosis of mental retardation.

For the reasons below, the Court finds these arguments unconvincing, and concludes that the defendant's significantly subaverage intellectual functioning satisfies the first prong of the AAMR and DSM-IV-TR definitions of mental retardation.

*1. Distinguishing Mild Mental Retardation (MMR) From Learning Disability (LD)*

The AAMR User's Guide recognizes that it may be difficult to differentiate between persons with mild mental retardation with a higher IQ (i.e., close to 70), and persons with learning disabilities:

> [I]t is important to consider the similarities between individuals with MR/ID [mental retardation or intellectual disabilities] with a higher IQ and individuals who are diagnosed as having a learning disability (LD). Both this group and those diagnosed as LD exhibit major problems in adaption related to academic performance and social competence. They differ, however, in that *LD is defined on the basis of discrepancy*

-13-

*between aptitude (as measured by a normal IQ) and academic achievement or by the* assessment model of Response to Intervention; whereas *those with MR/ID with a higher IQ are defined in terms of relative consistency between their subaverage IQ and achievement, as indicated by low performance on average across academic areas.*

User's Guide at 16-17 (citations omitted) (emphases added).

In response to a question by the Court, Dr. Shapiro testified that he was familiar with the above quote from the User's Guide. He agreed with the statement, adding that persons with LD do not exhibit adaptive deficits to the same degree as those with MMR. Furthermore, some individuals whose IQ falls in the range associated with mental retardation do not achieve academically even to the level that would be expected for that IQ. For example, some persons with MMR can read at up to a sixth grade level; thus, if an individual with MMR is only displaying reading skills at a second grade level, there is a possibility that the person has MMR *and* a simultaneous learning disability. The two are not mutually exclusive. *See* DSM-IV-TR at 47 ("A Learning Disorder or Communication Disorder can be diagnosed in an individual with Mental Retardation if the specific deficit is out of proportion to the severity of the Mental Retardation.").

Dr. James concurred with the AAMR's formulation[9] of the MMR/LD distinction. She testified that LD is a specific deficit in one or more academic areas in the *absence* of intellectual deficit, or what she referred to as "unexpected underachievement." When the individual's IQ score is low, the academic underachievement is not surprising, and mild mental retardation is most likely the correct diagnosis:

> [S]ignificant global impairments in conceptual and abstract thinking ability are generally not seen in learning disabilities, in which the primary problem is typically a focused deficit in one or more aspects of academic functioning (e.g. reading, math, written expression). This distinction holds true even when an individual has academic deficits which are severe (i.e. an individual is functionally illiterate).

---

[9] The DSM-IV-TR draws the distinction in the same way: "In Learning Disorders or Communication Disorders (unassociated with Mental Retardation), the development in a specific area (e.g., reading, expressive language) is impaired but there is no generalized impairment in intellectual development and adaptive functioning." DSM-IV-TR at 47.

Def. Ex. 1, Report of Dr. Joette James, 5 (hereinafter, James Rep.). In other words, an individual with MMR will have generalized deficits, whereas a person with LD will exhibit underachievement limited to specific areas.

### 2. Davis' Pervasive Deficits Preclude A LD Diagnosis

When Dr. James reviewed the voluminous records of the defendant's childhood testing, she concluded that MMR could not be ruled out in favor of a learning or communication disorder. In her opinion, the testing demonstrated that he had deficits that were pervasive across neuropsychological domains, which included aspects of visual processing and nonverbal reasoning. She determined that the defendant did not have a learning disability because of the global nature of his deficits and his inability to think abstractly.

She did not find it particularly important that he had not been classified as MMR during his school years, because she opined that schools have a strong bias against classifying a student as mentally retarded. She pointed out that parents do not like or want that label because of the stigma associated with it, so schools often categorize children as LD or "slow learners" instead. *See* AAMR 2002 at 31-32 (citing professional literature demonstrating that schools are hesitant to diagnose students with low IQs as having mental retardation, and more often classify them as having learning disabilities).

Other defense experts also identified the defendant as having broad deficiencies that extended beyond learning, reading, and writing skills. Dr. Nagele found that he was deficient in his memory functioning and his executive functioning. Dr. Woods also agreed that he had poor executive functioning, and opined that he communicates at approximately the level of an eleven-year old child. The defendant is able to express concrete thoughts, but cannot extrapolate to the general or conceptual level.

In short, the Court finds that the defendant does not exhibit the type of "unexpected" underachievement that is indicative of a learning disability. Rather, his academic and adaptive difficulties were to be expected, based on his consistently low scores on IQ tests and other measures of verbal and non-verbal functioning. Even if the Court were to conclude that the defendant had a language-based learning disability, that disability is clearly superimposed upon other, existing

-15-

intellectual deficiencies. In any event, the Court concludes that the defendant's intellectual deficits are pervasive and not limited to a specific aspect of academic performance, as would be the case if he were learning disabled only.

### 3. Full Scale IQ Is Best Indicator of Overall Cognitive Ability

The government's experts attempted to minimize the importance of the defendant's full scale IQ score of 70 on the WAIS-IV administered by Dr. Spector in early 2009. Typical comprehensive IQ tests produce at least three scores, which include a verbal IQ (VIQ) and performance IQ (PIQ), or the equivalent, that measure different aspects of intelligence, and a full scale IQ (FSIQ) that is the statistical, or weighted, average of the VIQ and PIQ. The FSIQ is the product of a statistical procedure called "factor analysis," and is not a simple numerical average.[10] Antell Test. 16, March 27, 2009 (hereinafter, Antell Test.). The FSIQ is intended to summarize roughly how the individual performs on the test relative to others. Antell Rep. 2.

Dr. Spector attempted to downplay the significance of the defendant's FSIQ because of his belief that Davis was not putting forth sufficient effort on tests of non-verbal ability. Dr. Spector administered three tests to the defendant that are designed to assess test-taking effort. Two of the three, the Victoria Symptom Validity Test and the Word Memory Test, indicated that he *was* putting forth adequate effort. On the third test, the Validity Indicator Profile (VIP), Dr. Spector said the results were "a little more ambiguous." Spector Test. Vol. 1, 83. He concluded that the defendant was giving satisfactory effort on the verbal section, but not on the non-verbal section. Based on this finding — on one-half of one out of three tests — Dr. Spector concluded that the defendant's performance on the WAIS-IV accurately reflects his verbal ability but underestimates his non-verbal ability, and therefore his intellectual functioning is probably higher than the FSIQ of 70 would indicate. However, on cross examination, when presented with a passage from the WAIS-IV manual, Dr. Spector admitted that it states, "in general, the full scale IQ is considered *the most valid measure*

---

[10] Dr. Antell explained that although Davis' PIQ exceeded his VIQ by 15 points, if other scores remained the same, his FSIQ would not change even if these scores were reversed. In other words, the FSIQ does not give more weight to the verbal score in relation to the performance score. Antell Test. 16-17.

*of overall cognitive ability.*" Spector Test. 66, March 27, 2009 (hereinafter, Spector Test. Vol. 2) (emphasis added).

The Court finds Dr. Spector's opinion regarding the defendant's test-taking effort conclusory, at best, and inconsistent with the fact that his scores have been remarkably consistent over a period of more than 25 years, including a number of times when no incentive to malinger or exaggerate deficits would have been present. Moreover, his disregard of the FSIQ is at odds with the significance attributed to it by the publisher of the assessment measure.

Dr. Antell's criticism appears to extrapolate from a caveat in the DSM-IV-TR that states:

> When there is a significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ can be misleading.

DSM-IV-TR at 42. Dr. Antell stated in her report that "some authors" advocate not reporting FSIQ when the difference between verbal and performance scores is statistically significant, or about 12 points. Because Davis scored a 66 on the Verbal Comprehension Index (VCI) and an 81 on the Perceptual Reasoning Index (PRI), Dr. Antell argued that the defendant's FSIQ was "misleading," (i.e., not indicative of his actual abilities), the implication being that Davis could not be found mentally retarded based on that FSIQ. In her opinion, the defendant's 15-point discrepancy between verbal and non-verbal performance was inconsistent with a diagnosis of MR. She believes that "[w]hile there is no **explicit** statement that a diagnosis of MR requires both scores to be below 70/75, this notion is clearly implicit in virtually every discussion regarding how IQ tests are to be interpreted." Antell Rep. 3 (bold in original).

The Court does not find these arguments credible or persuasive. First, Dr. Antell cited to no cases or authorities to support her contention that a MR diagnosis should not be made unless both verbal and performance scores are below 75, and the Court is not aware of any. This requirement was not mentioned by any of the other experts, and the Court has found other federal cases in which defendants were found to be mentally retarded, despite having one or more sub-test scores above 75. *See, e.g., Holladay v. Allen,* 555 F.3d 1346, 1354-55 (11th Cir. 2009) (crediting FSIQ from two administrations of the WAIS, in one of which the defendant received a verbal score of 64 and a

-17-

performance score of 81, for a FSIQ of 69, and another with a verbal score of 69 and performance score of 80, with a FSIQ of 72).

Next, while the DSM-IV-TR states that the FSIQ may be "misleading" in certain circumstances, it does not specify an alternative method for numerically representing a defendant's intellectual capabilities in the forensic context. Furthermore, there was no evidence of a "marked" discrepancy between the defendant's verbal and non-verbal scores on previous IQ tests.[11] James Rep. at 3 ("when one examines Mr. Davis' 1992, 2006, and 2009 subtest scores, there is notable consistency in his performance"). If the defendant's FSIQ on the WAIS-IV was truly "misleading," one would expect it to be out of proportion with the previous test scores, but it is not.

Finally, Dr. Antell's premise that "in order to make a diagnosis of mental retardation, one must first **exclude** other factors which might impact on IQ test or adaptive performance" is simply incorrect. Antell Rep. 2-3 (bold in original). The DSM-IV-TR states clearly that "[t]he diagnostic criteria for Mental Retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder." DSM-IV-TR at 47.

In conclusion, the Court finds that the defendant's intellectual deficits are not attributable to a learning disability, and are sufficiently significant as to satisfy the first prong of a mental retardation diagnosis. Although FSIQ scores may be misleading in some extreme circumstances, the Court does not find that the discrepancies between the defendant's verbal and non-verbal scores in this case warrant deviation from the general rule that FSIQ is the best approximation of an individual's overall cognitive functioning. The Court therefore will consider the defendant's FSIQ scores when evaluating his intellectual abilities.

## B. The Flynn Effect

The so-called Flynn effect is a phenomenon identified and discussed in a series of widely-cited papers by James R. Flynn, a professor emeritus of political studies at the University of Otago in New Zealand. It refers to the fact that virtually all nations in the developed world show an upward

---

[11] Even Dr. Antell testified that when the defendant was tested in 1982, "there was very little scatter." Antell Test. 105.

trend in performance on IQ tests from and after the date they are developed or "normed." Thus, the Flynn effect means simply that the population generally will achieve higher scores on IQ tests proportional to the amount of time between when the test was normed and when it was taken. The amount of the increase varies with the instrument, but is approximately 3 points per decade, or 0.33 points per year.

Standardized measures of IQ are normalized ("normed") on a given population such that the average, or mean, score is 100. The standard deviation, or the amount by which the typical person who does not score 100 varies from 100, is about 15. Therefore, a score of two standard deviations below the mean, which is the approximate cutoff for mental retardation, is 70 (plus or minus the standard error of measurement (SEM) of five points). What the Flynn effect means is that over time, the test norms become outdated, such that the average score is no longer 100, but something higher. Consequently, a score two standard deviations below the mean would be higher than 70, but still indicative of mental retardation. Corrections for the Flynn effect adjust scores to account for the amount of time between when the test was originally normed and when it was administered to an individual. This allows for fair comparisons between scores obtained at different times:[12]

> No matter whether the criterion is set at an IQ of 55 or 70 or 85, the defendant must be assessed against current norms and not obsolete norms that inflate his or her score. Otherwise, one person will meet the criterion of mental retardation, and another person will be judged not to have done so, purely because one took a test with current norms and the other took a test with obsolete norms. No matter what the criterion, who meets it must not be a matter of chance.

Def. Ex. 13, James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 PSYCH. PUB. POLICY AND LAW 170, 176 (2006). The general rule is to deduct 0.3 IQ points per year

---

[12] Flynn gives the following example of why failing to adjust IQ scores for gains over time is "to take flight from reality. Suppose you are coaching an athlete who aspires to qualify for the Olympic high jump. He jumps 6 feet 6 inches, and you assure him that he will qualify. He replies: 'But that was the standard in 1985. Since then, performances have improved, and today, I have to jump 7 feet to qualify. You are judging my performance in terms of the norms of yesterday rather than today.' He would do well to hire a new coach." Def. Ex. 13, James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 PSYCH. PUB. POLICY AND LAW 170, 173 (2006).

from the scores of defendants for every year between the time when the test was normed and when it was taken. Def. Ex. 13, Flynn, *Tethering the Elephant*, at 179.

While support for the use of the Flynn effect to adjust IQ scores in the forensic context may not be universal, it is widespread. All of the defense experts in this case agreed that application of the Flynn effect is appropriate in forensic scenarios such as this one, and accounted for it in conducting their evaluations and rendering their opinions.

Flynn himself expressed the potentially deadly consequences of not adjusting scores: "Failure to adjust IQ scores in the light of IQ gains over time turns eligibility for execution into a lottery – a matter of luck about what test a school psychologist happened to administer." Def. Ex. 13, Flynn, *Tethering the Elephant,* at 174-75. Another well-known psychologist, Stephen Greenspan, has agreed, calling consideration of the Flynn effect "appropriate" and "essential." Greenspan stressed the incredibly high stakes involved in forensic evaluations in capital cases, stating:

> Given that mild MR is a somewhat inadequately-defined category, it is important to err in very close cases on the side of being overly inclusive, especially given the potentially fatal consequences of a false negative diagnostic conclusion. Use of the Flynn effect is a useful, and valid, method for increasing the likelihood that a psychologist will correctly diagnose MR in someone deserving of that label.

Def. Ex. 18, Stephen Greenspan, *Issues in the Use of the "Flynn Effect" To Adjust IQ Scores When Diagnosing MR*, PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES (American Psychological Association/ Division 33, Washington, D.C.), Spring 2006, at 3, 7.

Federal courts have also acknowledged the appropriateness of considering Flynn-adjusted scores. *See Holladay*, 555 F.3d at 1358 (acknowledging possibility that WAIS scores may have been elevated because of the Flynn effect); *Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005) (criticizing district court for refusing to consider "relevant evidence, namely the Flynn Effect evidence" and directing the district court to consider its persuasiveness on remand).

Importantly, the Court notes that the AAMR User's Guide, which the experts in this case all found to be authoritative on the subject of diagnosing mental retardation, unambiguously advises clinicians conducting retrospective diagnoses to "Recognize the 'Flynn effect.'" User's Guide at 20-21 ("In cases where a test with aging norms is used, a correction for the age of the norms is

warranted."). The adjustment recommended in the <u>User's Guide</u> is a reduction of 0.33 IQ points per year between the date the test was normed and when it was administered. The Court finds very persuasive this endorsement by the AAMR, in a section of the text specifically addressing the type of retrospective diagnoses necessitated by "sentencing eligibility questions such as those related to the recent Atkins . . . case." *Id.* at 17.

The government experts attempted to discredit the validity of the Flynn effect. Dr. Spector was unusually critical of the defense experts' calculations in his report:

> It (sic) what is at best an act of revisionist history and at worst a deliberate effort to distort the record, Defense's experts have attempted to invoke the work of Flynn and colleagues to deflate Mr. Davis's IQ scores as a function of time passed between the time a given IQ test was published and the time it was administered to Mr. Davis. To the best of my knowledge, there is no evidence that such efforts improve the reliability or validity of IQ scores in the *individual case*. . . . There is simply no *clinical setting* where Flynn corrections are routinely in voked, and the prevailing standard of professional care does not require such correlations when interpreting IQ scores in individual patients, claimants, subjects, or defendants.

Gov. Ex. 36, Report of Dr. Spector, 15 (hereinafter, Spector Rep.) (emphases added).

For several reasons, the Court completely discredits Dr. Spector's opinion on this point. First, Dr. Spector seemed to believe that the Flynn effect is appropriate only for the evaluation of population, as opposed to individual, data. He testified that he "chafes at the use of theoretical population-driven data to deflate an individual's IQ score for a particular purpose." Spector Test. Vol. 2, 43. This would seem to suggest that while Dr. Spector acknowledges the trend of IQ scores to increase over time, he believes that an individual capital defendant should not benefit from a downward adjustment of his score when his IQ is being assessed for the purpose of determining whether he may be sentenced to death. The Court rejects this logic, as does Flynn himself:

> I wish to call attention to another argument put forward by prosecutors, namely, that the Flynn effect is a "group phenomenon" and cannot be applied to individuals. As the reader now knows, this is just a senseless mantra. When the group making the IQ gains is composed of Americans, those gains render test norms obsolete and inflate the IQ of every individual being scored against the obsolete norms.

Def. Ex. 13, Flynn, *Tethering the Elephant*, at 186.

Next, Dr. Spector states that the Flynn effect is not routinely applied in *clinical* settings as a matter of professional practice.  Dr. Antell echoes this complaint, writing in her report that "[t]he making of such adjustments is virtually never seen outside of forensic contexts, and the use of any formula to do so has never been subject to the peer review and testing which would be required for it to become an accepted part of psychological and neuropsychological methodology." Antell Rep. 7.

While this may be true, the Court finds this to be completely irrelevant. This *is* a forensic context, and an important one in which a man's life hangs in the balance. The goals of an IQ assessment are dramatically different in the clinical versus the forensic setting.  In the clinical context, the purpose of such an assessment is typically to get an accurate picture of the individual's current functioning so that appropriate systems of support may be devised to assist that individual in everyday living. In most cases, a recently-normed instrument will be used for the IQ assessment, rendering unnecessary any Flynn adjustments.

In the forensic context, however, where an individual's eligibility for a death sentence depends on a somewhat arbitrary numerical cutoff, precision and accuracy in determining that individual's IQ score, both at present and in the past, become critically important. Eligibility for the death penalty is not a lottery, and a greater effort to achieve accurate results is both necessary and appropriate.

Apart from eligibility for certain entitlement programs, in the clinical setting, the precise value given to an individual's IQ has very little consequence, so there would be very little gained by adjusting the numerical score to account for changed norms when the clinician could simply take the phenomenon into account when interpreting the scores. Gov. Ex. 21, Roger B. Moore, Jr., Letter to the Editor, *Modification of Individual's IQ Scores is Not Accepted Professional Practice*, PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES (American Psychological Association/ Division 33, Washington, D.C.), Fall 2006, at 11, 12 ("If there are factors that lead the psychologist to believe that the scores do not represent an accurate or reliable measure of the individual's functioning, such issues are delineated in the discussion and interpretation of the scores; the scores themselves are not changed.  Modification of individual scores is not accepted

professional practice, for good reason, and should not be introduced into court as such."). However, where a life-or-death categorization depends on a strict numerical cutoff, failure to adjust individual scores in light of changed norms would be unwise — if not reckless — and certainly would *not,* as Dr. Spector suggested, be a "deliberate effort to distort the record."

In conclusion, the Court finds the defendant's Flynn effect evidence both relevant and persuasive, and will, as it should, consider the Flynn-adjusted scores in its evaluation of the defendant's intellectual functioning.

C. Conclusion As To Intellectual Functioning

Having concluded that the defendant's intellectual deficits cannot be explained away by a learning disability, and that the Court should evaluate his Flynn-adjusted FSIQ scores rather than his raw scores, all that remains is to determine whether his scores place him at least two standard deviations below the mean. Taking into account the standard error of measurement, this would require an IQ score at or below 75.

In 1982, the defendant's Flynn-adjusted score on the WISC[13] was 66; in 1992, his Flynn-

---

[13] There was some debate at the hearing as to whether the test administered to the defendant in 1982 was a WISC or a WISC-R. The report of Dr. Ida Baron dated 7/22/82 states that "the Wechsler Intelligence Scale for Children-Revised was administered to assess general intelligence." (Baron Rep. at 1) However, the very next paragraph states that the "Wechsler Intelligence Scale for Children was administered at school in July 1982." *Id.* The rest of the report consistently refers to the test as the WISC. *Id.* Jo-Cheryl Cooper, the psychologist who administered the 1982 test, wrote in her report that the test used was the WISC. Thus, the only reference to the test as a WISC-R is a single line in Dr. Baron's report, in which she was describing a test performed by someone else.

Dr. Antell argued that it was "typical shorthand" to list the procedure administered at the top of a report, then to refer to the test by its shortened name (i.e., WAIS or WISC) throughout the rest of the report. Because the WISC-R was published in 1972, she believed it was unlikely that the older WISC was used. Antell Test. 104. Dr. James disagreed, believing that it was much more likely that Dr. Baron's single reference to the WISC-R was a typo, and the actual test administered was a WISC. James Test. March 31, 2009. In addition, Flynn has noted that because IQ tests are expensive, schools tend to exhaust their old supply before ordering the new edition of a test. Def. Ex. 13, Flynn, *Tethering the Elephant*, at 185.

The only significance of this debate is its impact on the degree of the Flynn adjustment to the defendant's 1982 FSIQ of 75. If the test was a WISC, the Flynn-adjusted score is 66, because the WISC was published in 1949. If, instead, the test was a WISC-R that was published in 1972,

adjusted score on the WAIS-R was 73; in 2006 on the WAIS-III, his Flynn-adjusted score was 62; and in 2009, his score on the WAIS-IV was 70 (no adjustment was needed because the test was published in 2008). *See supra,* Part 1.III. These scores each place Davis within the range associated with mental retardation individually, and the mean is 67.7. Even if the Court were to conclude, as Dr. Spector did, that the defendant was not expending his full effort during Dr. Donnor's testing in 2006, and excluded that score, the mean of the other three scores is 69.6, which still leaves the defendant in the range associated with mild mental retardation.

This information alone would be enough to support the Court's conclusion that the defendant has significantly subaverage intellectual functioning. Further test results in the record, however, give the Court added confidence that his deficits are real, not malingered or exaggerated, and have been documented consistently and repeatedly over the course of his lifetime, beginning in childhood. For example, in 1982, at age 12, the defendant was administered the Peabody Picture Vocabulary Test (PPVT) by D.C. public schools. He scored 64, placing him in the first percentile, or the lowest 1% of children taking the test. Decades later, in 2009, he was administered the PPVT by the government's expert, Dr. Spector. His score of 66 indicated that he remains in the first percentile, even after many years of failed interventions and attempts to improve his reading and language skills.

The defendant's history on academic achievement tests are also remarkably consistent over time, and indicative of severe and pervasive intellectual and academic deficits. These scores are summarized below:

---

the defendant's Flynn-adjusted score is 72. The Court finds this ambiguity irrelevant, because both Flynn-adjusted IQ scores place the defendant in the range associated with mild mental retardation.

| ADMINISTRATOR/ TEST | DATE | AGE | WORD RECOGNITION GRADE LEVEL | SPELLING GRADE LEVEL | ARITHMETIC GRADE LEVEL |
|---|---|---|---|---|---|
| D.C. schools – WRAT[14] | 1982 | 12 | 2.5 | 2.1 | 3.0 |
| Rehabilitation Serv's Admin (RSA) – WRAT | 1992 | 21 | 2.0 | 1.0 | 5.0 |
| Dr. Nagele – WIAT-II[15] | 2008 | 38 | 2.1 | 1.9 | 3.5 |
| Dr. Spector – WRAT-4 | 2009 | 38 | 2.3 | 2.0 | 3.8 |

In sum, the Court finds it abundantly clear that the defendant has a significant limitation in intellectual functioning that is at least two standard deviations below the mean. Therefore, the Court will now proceed to evaluate the defendant's level of adaptive functioning in order to determine whether Davis is mentally retarded.

## II. Adaptive Functioning

Adaptive behavior refers to the skills that are required for people to function in their everyday lives. In one sense, adaptive behavior addresses how persons apply their cognitive potential. Dr. Olley described mental retardation as "the failure to carry out everyday activities at the level expected of adults." Def. Ex. 17, J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 1*, PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES (American Psychological Association/ Division 33, Washington, D.C.), Summer 2006, at 2, 2 (hereinafter, Olley I). In other words, one may conceive of significant impairment in adaptive behavior as "the extent to which the individual has required assistance to carry out age-appropriate activities." Def. Ex. 17, J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 3*, PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES

---

[14] Wide Range Achievement Test

[15] Wechsler Individual Achievement Test II

(American Psychological Association/ Division 33, Washington, D.C.), Summer 2007, at 3, 4 (hereinafter, Olley III).

Adaptive behavior may be assessed by two different constructs– the classification in AAMR 2002 and the classification in DSM-IV-TR, which essentially measure the same skills.

The DSM-IV-TR classification of adaptive behavior addresses ten domains: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and heath/safety. A diagnosis of mental retardation requires a significant limitation in at least two of the ten domains. *See* DSM-IV-TR at 41.

The AAMR classification divides adaptive behavior into three broader categories: conceptual, practical, and social. Diagnosis of mental retardation requires a significant limitation in one of the three categories. Conceptual skills include language, reading and writing, money concepts, and self-direction. Social skills include interpersonal skills, personal responsibility, self-esteem, gullibility, following rules, obeying laws, and avoiding victimization. The practical category includes the activities of daily living, including personal hygiene and grooming as well as home and financial management, occupational skills, and maintenance of a safe environment. *See* AAMR 2002 at 82.

A. How Adaptive Behavior Should Be Assessed

Determining whether an individual's adaptive functioning is more than two standard deviations below the mean in any given domain or category is inherently more difficult than determining whether that subject's intellectual functioning is below that level. Adaptive behavior is a broader category, and more amorphous, than intellectual functioning. Therefore, the Court believes it is important to have an understanding of what are considered the best professional practices for the assessment of adaptive functioning, as it bears on the relative credibility of the experts in this case.

The assessment of adaptive behavior is more difficult to quantify when a subject is presently incarcerated. The DSM-IV-TR advises that "[i]t is useful to gather evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history)." DSM-IV-TR at 42; *see also* User's Guide at 18-22.

Several scales have also been designed to measure adaptive functioning or behavior, including the Vineland Adaptive Behavior Scales and the American Association on Mental Retardation Adaptive Behavior Scale. <u>DSM-IV-TR</u> at 42. Though the <u>DSM-IV-TR</u> does not *require* the use of a standardized adaptive behavior scale, doing so appears to be highly advisable. The AAMR 2002 manual states unequivocally that "[o]bservations, interviews, or other methods of assessment to gather information about adaptive behavior may complement, *but ordinarily should not replace*, standardized measures." AAMR 2002 at 84 (emphasis added).

The AAMR <u>User's Guide</u> specifically addresses how one should assess adaptive behavior when one is forced to conduct a retrospective diagnosis:

> In reference to the assessment of adaptive behavior: (a) use multiple informants and multiple contexts; (b) recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture; (c) be aware that many important social behavioral skills, such as gullibility and naivete, are not measured on current adaptive behavior scales; (d) use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant; (e) understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; and (f) realize that adaptive behavior refers to typical functioning and not to capacity or maximum functioning.

<u>User's Guide</u> at 20. The <u>User's Guide</u> goes on to advise clinicians to "recognize that self-ratings have a high risk of error in determining 'significant limitations in adaptive behavior,'" but that they can be used with caution in conjunction with multiple informants or respondents. *Id.* at 21. It also instructs evaluators not to rely upon past criminal or verbal behavior to make inferences about adaptive functioning or the presence of mental retardation. *Id.* at 22.

In 2006 and 2007, Dr. Olley published a three-part series in the official publication of the APA Division 33[16] titled "The Assessment of Adaptive Behavior in Adult Forensic Cases." Def. Ex. 17. In it, he discussed the efforts of Division 33's *Ad Hoc* Committee on Mental Retardation and the Death Penalty to work toward the establishment of practice standards that would allow courts to judge more objectively whether an evaluation or testimony bearing on the question of mental

---

[16] Division 33 focuses on Intellectual and Developmental Disabilities.

retardation followed the best practices of the psychology profession.  In his first piece, Dr. Olley notes that when a court requires an assessment of a defendant's current adaptive functioning, standard approaches are not effective, because "prison life offers no opportunity to demonstrate most areas of adaptive functioning."  Def. Ex. 17, Olley I at 2.  He later continued, "Our typical procedures for assessing adaptive functioning are compromised when we investigate functioning retrospectively to the time of the crime or to childhood.  The typical approach is to seek adaptive behavior information from several sources and to look for convergence of findings." Def. Ex. 17, Olley III at 4.  Dr. Olley stressed at the outset of his discussion that the process of assessing adaptive behavior, particularly in a retroactive sense, "is a matter of drawing information from many sources, *all of which are imperfect.*" Def. Ex. 17, J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 2*, PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES (American Psychological Association/ Division 33, Washington, D.C.), Fall 2006 (hereinafter, Olley II) (emphasis added).

Dr. Olley identified a number of potential ways for clinicians to gather information about a defendant's adaptive functioning: (1) interview the defendant; (2) test the defendant's knowledge; (3) test the defendant's performance; (4) interview family members, neighbors, friends, and former employers; (5) administer an adaptive behavior scale to third-party reporters; (6) administer an adaptive behavior scale to the defendant; (7) examine objective archival information (e.g., school records, eligibility tests for Social Security benefits, etc.); (8) review subjective archival information (comments by teachers, coaches, counselors, etc.); and (9) apply clinical judgment. Def. Ex. 17, Olley III at 4-5.

The Court believes that the AAMR 2002 manual, the User's Guide, and Dr. Olley's series of articles reflect a relative consensus that the best way to retroactively assess a defendant's adaptive functioning is to review the broadest set of data possible, and to look for consistency and convergence over time.  It is with this in mind that the Court has evaluated the testimony and evidence presented on this issue in the present case.

1. ABAS-II and Feigned Deficits

During his testimony, Dr. Spector referred to "some evidence from the published literature"

indicating that administration of standardized assessments of adaptive behavior to friends and family members of a capital defendant "may be unreliable." Spector Test. Vol. 1, 29. In both his testimony and his report, Dr. Spector referred to an article in the scientific journal *Law and Human Behavior* that described a study designed to assess the susceptibility of the ABAS-II and the Scales of Independent Behavior - Revised (SIB-R) to the feigning of adaptive functioning deficits. Gov. Ex. 12, Bridget M. Doane & Karen L. Salekin, *Susceptibility of Current Adaptive Behavior Measures to Feigned Deficits*, LAW & HUM. BEHAV. (APA Division 41/ American Psychology-Law Society 2008). Dr. Spector testified that the article found that measures of adaptive functioning can be feigned (i.e., that abilities can be downgraded or underreported), and that this feigning cannot be well-detected on the ABAS-II, leaving the ABAS-II vulnerable to manipulation through "coaching by attorneys, advocates, family members, and other interested parties." Spector Rep. 5. According to Dr. Spector, the authors also concluded that the SIB-R was "found to be a more superior adaptive functioning measure . . . specifically because feigned impairment is more easily spotted by abnormally low scores."[17] Spector Test. Vol. 1, 30. In other words, study participants who were instructed to feign were undetectable from scores generated by individuals who had not received such instruction. Spector Test. Vol. 1, 31. Dr. Spector relied, in part, upon this study in deciding not to interview the defendant's friends and family, and to discount ABAS-II administrations given previously by defense experts.

Upon review of the article, the Court finds Dr. Spector's summary of Doane & Salekin's findings to be accurate. However, the Court does not find this a prudent basis on which to completely eschew the use of adaptive behavior scales or interview of potentially biased third parties. As Dr. Olley has clearly stated in his series of articles in *Psychology In Mental Retardation and Developmental Disabilities*, nearly *all* methods of assessing an individual's adaptive functioning — particularly in a retroactive analysis — are imperfect. Even if ABAS-II scores from the defendant's friends and family would not have been, in Dr. Spector's opinion, 100% reliable, it would have been of much greater assistance to the Court to have the data, and allow experts to argue what weight should be given to that data, than to not have any data at all. Although Doane & Salekin concluded

---

[17] Curiously, Dr. Spector did not explain why he did not administer a SIB-R in lieu of an ABAS-II.

that feigning on the ABAS-II was not detectable by examining the test results alone, it would seem that feigning *could* be detected by comparing the ABAS-II scores with the wealth of other information about the defendant that is present in the record, and which Dr. Spector had at his disposal. As Dr. Olley has written, the typical approach used in forensic assessments of adaptive functioning is to collect information from a multitude of sources and look for convergence of findings in order to confirm one's conclusions. Def. Ex. 17, Olley III ("A documented pattern of deficits in adaptive behavior from childhood until the time of the crime is a strong indicator that the defendant is not malingering or "faking" mental retardation."). The Court finds the approach recommended by Dr. Olley to be sounder than that espoused by Dr. Spector.

## 2. Jail Phone Calls/ Verbal Behavior

In this case, the government experts relied heavily in their reports and in their testimony on verbal behavior of the defendant in the form of recorded telephone conversations made from the Prince George's County Detention Center (PGCDC). For example, in his report, Dr. Spector relied on the recorded conversations for the following factual underpinnings of his conclusions (i.e., skills he attributed to the defendant): reading the newspaper, focusing on articles relevant to his case and his health; reading poems and inspirational passages; directing a friend to use a computer to search for information related to his case and DNA; managing his personal finances; courting and engaging in flirtatious behavior with "presumably intellectually normal women" and playing one woman friend against another; advising family members how to "beat the system" by faking an auto theft to collect insurance payments; understanding what housing costs are and what represents a good buy; and appreciating the value of saving money. Spector Rep. 6-14. The government also relied heavily on the recorded calls during cross examination of the defendant's experts.

The Court finds these telephone calls largely irrelevant to the assessment of the defendant's adaptive functioning. First, they do *not* reflect that the defendant is able to read and/or write. The Court finds the defendant's claims that he reads the newspaper and books from the library — at anything beyond a superficial level — simply incredulous given the overwhelming evidence of his lifelong reading and language disabilities. Rather, these conversations are evidence of what the defense experts referred to as the "cloak of competence," which is the powerful tendency of mildly

-30-

mentally retarded people to mask or compensate for their deficits. Def. Ex. 2, presentation of Dr. Shapiro, at 45.

Second, the calls demonstrate that the defendant has some strengths, particularly in the area of social skills, but these strengths do not counter his established deficits. Furthermore, the conversations themselves often are illogical and reflect only concrete speech and thought patterns, but not any conceptual expression, which is entirely consistent with mild mental retardation. Woods Test., March 31, 2009.

Finally, there is simply not enough information in the conversations to make any sort of reliable conclusion about the defendant's actual performance of adaptive behaviors. He may not have actually been able to do the things he discussed and, in any case, a number of those actions are not beyond the capabilities of someone with mild mental retardation. The User's Guide advises clinicians to not use verbal behavior to make inferences about an individual's adaptive behavior or the presence of mental retardation for this precise reason. See User's Guide at 22.

The referenced book chapter that is cited in the User's Guide for this proposition has now been published. Def. Ex. 26, Stephen Greenspan & Harvey N. Switzky, Lessons from the Atkins Decision for the Next AAMR Manual in AAMR, What is Mental Retardation? Ideas for an Evolving Disability in the 21st Century (Harvey N. Switzky & Stephen Greenspan, eds., rev. ed. 2006). There, the authors explain in detail why verbal behavior is not a reliable indicator of adaptive functioning. First, "not enough information is typically available (on a precise microlevel) regarding the exact situational demands and the level of cognitive skills required to navigate those demands." Def. Ex. 26, Greenspan & Switzky, Lessons from the Atkins Decision, at 291. Second, a defendant's seeming verbal fluency, suspiciously learned vocabular y, or seeming degree of verbal insight, is all "nonstandardized data which is purely qualitative in nature and does not really provide a basis for making a diagnostic judgment." Def. Ex. 26, Greenspan & Switzky, Lessons from the Atkins Decision, at 292. People with mental retardation, particular mild forms, "typically have normal language syntax and can be very facile verbally." Def. Ex. 26, Greenspan & Switzky, Lessons from the Atkins Decision, at 292. It is very clear to the Court that, in most cases, one cannot detect mental retardation simply by having a conversation with that person, and it therefore seems more unlikely that one could reliably base such a diagnosis on recorded conversations that are much more

ambiguous and lacking context than a clinical interview.

### 3. How Defendant's Functioning While In Jail Should Be Evaluated

The government's evidence included testimony from three corrections officers at the PGCDC. These witnesses were familiar with the defendant and his conduct within the jail. They testified that Davis functions well as a "detailee," which is a title give to a worker within the housing unit responsible for such tasks as mopping floors, cleaning showers, and dispersing and collecting meal trays. The officers reported that the defendant did not need special instruction or supervision to accomplish these tasks.

Officer Hallock testified that when the defendant injured his back, he was able to fill out a slip to see a nurse after she recommended that he do so. She observed him appearing to read the newspaper, but never discussed the contents with him. Officer Hallock and Officer Ogunomala both testified that the defendant regularly used the gym and enjoyed exercising. Officer Ogunomala testified that the defendant was often seen around a chessboard with varying numbers of other inmates, but the officer admitted he does not know the rules of chess and has no way of knowing if the defendant could actually play the game properly.

The Court was unimpressed with this testimony. First, detailees perform precisely the type of rote, repetitive tasks that persons with mental retardation are often capable of doing well. Next, the corrections officers simply did not have enough information about the defendant's level of reading comprehension or acuity at the game of chess for the Court to infer anything about Davis' true level of cognitive ability. Finally, keeping to an exercise routine or seeking medical care within a precisely managed, structured jail setting, in which an officer reminds inmates to sign up for the gym list, or suggests they see the nurse when they are sick or injured, says nothing about the inmate's ability to take responsibility for his own health and safety while in the general community.

### B. Defense Experts' Assessment of Davis' Adaptive Functioning

On the issue of the defendant's adaptive functioning, the defense relied primarily on Dr. Olley and Dr. Woods, and to a lesser extent on Dr. Shapiro. Both Dr. Olley and Dr. Woods reviewed voluminous medical, educational, and social records, conducted numerous interviews of the

defendant and others, and administered standardized scales designed to measure adaptive functioning and behavior.  Their findings are summarized below.

### 1. Dr. J. Gregory Olley

Dr. Olley reviewed a large number of documents, including records from Children's Hospital, the Lab School of Washington, Rehabilitation Services Administration, Social Security Administration, the defendant's juvenile social file from the Superior Court of the District of Columbia, five different set of school records, Dr. Spector's test data, the WAIS-III IQ test from 2006, and all the material the U.S. Attorney's office provided to Dr. Spector, including recordings and transcripts of 15 telephone calls that the defendant made from the Prince George's County Detention Center.  In addition, he conducted in-person interviews with the defendant, his niece Starta Tillman, his former girlfriend Necia (sometimes spelled "Nesia") Brown, his parents Earl and Shirley Davis, his adult daughter Earlishia Davis, and his half-brother Don Davis.  By phone, Dr. Olley also interviewed four former teachers or tutors, and a man at a company at which the defendant claims to have worked.

Dr. Olley also administered the Adaptive Behavior Assessment System (2d ed.) (ABAS-II) to two individuals who have known the defendant well at different stages of his life.  Don Davis, the defendant's older half-brother, was asked to provide information about the defendant's behavior at age 13.  Necia Brown provided information about his adaptive functioning at age 27, during which time they were living together.  The ABAS-II yields a composite score, scores on each of the ten areas of adaptive behavior identified by the AAMR in its 1992 manual[18], and scores for each of the three areas of adaptive behavior noted in the AAMR 2002 manual. Although Brown's ratings were consistently higher, both composite scores (63 and 71) were consistent with functioning in the range of mild mental retardation (two standard deviations below the mean). Def. Ex. 1, Report of Dr. J. Gregory Olley, 5 (hereinafter, Olley Rep.).  Dr. Olley considered these ABAS-II scores along with the rest of the record in formulating his opinion as to whether Davis was mentally retarded.

As a preface to his findings, Dr. Olley noted:

---

[18] These ten areas are the same as those listed in the DSM-IV-TR.

> It is important to note that the assessment of adaptive functioning focuses upon deficits. People with mild mental retardation typically have a mixed profile of strengths and weaknesses and show adequate functioning in many areas. . . . Thus, one's ability to function successfully in any of specific area adaptive behavior does not exclude the diagnosis of mental retardation.

Olley Rep. 5.

Dr. Olley concluded that Davis suffered from significant impairments in seven of the ten DSM-IV-TR criteria: Communication, Home Living, Community Use, Self-Direction, Health & Safety, Functional Academics, and Work. Using the AAMR criteria, Dr. Olley found Davis to be significantly impaired in the conceptual area, with some less severe limitations in the social and practical areas. Thus, in conjunction with the defendant's history of consistently low scores on intelligence tests, and based on the significant impairments in adaptive behavior that he perceived, Dr. Olley opined that the defendant is mentally retarded. Olley Rep.14-15.

### 2. Dr. George Woods

Dr. Woods reviewed a set of records either the same or substantially similar to that reviewed by Dr. Olley. In addition, Dr. Woods reviewed the reports of the four other defense experts: Drs. Olley, James, Shapiro and Nagele. Woods Rep. Appx. A. He conducted two interviews with the defendant, for a total of about five hours, and also spoke with his parents, niece Starta Tillman, and daughter Earlishia.

Dr. Woods structured his evaluation of the defendant's adaptive behavior within the three criteria in the AAMR 2002 manual. Like Dr. Olley, Dr. Woods found him to be significantly impaired in the area of conceptual skills. In particular, he noted that the defendant has consistently relied on others for assistance throughout his lifetime, that his thinking was very concrete, and he had almost no ability to analogize. Woods Rep. 9, 15. Dr. Woods found that social skills were an area of relative strength, and there were few outward manifestations of deficits in this area. Dr. Woods opined that the defendant had a "mixed level of abilities" in the practical skills areas; in some ways he adapts adequately, and in others he is significantly impaired.

Dr. Woods noted that the consistency of the defendant's scores and behaviors over time increases his confidence in the accuracy of the tests and his own opinion. In his opinion, it would

not be possible "to fake or malinger impairments such as these beginning at age 12 and continuing to the present day." Woods Rep. 17.

### 3. Dr. Bruce Shapiro

Dr. Shapiro, citing time constraints, did not personally interview the defendant or others who knew him well, but did review substantially the same set of records reviewed by Drs. Olley and Woods, including the work of one prosecution expert (presumably Dr. Spector), and the reports of Drs. James and Olley. Def. Ex. 1, Report of Dr. Bruce Shapiro, 2 (hereinafter, Shapiro Rep.). Dr. Shapiro agreed that the defendant demonstrated the requisite deficits in adaptive behavior so as to be diagnosed with mental retardation. He identified significant deficits in seven of the ten DSM-IV-TR criteria: Communication, Home Living, Community Use, Self-Direction, Health & Safety, and Functional Academics (which he highlighted as a "profound" deficit). Dr. Shapiro's interpretation of the record differed from Dr. Olley's only in the area of Work, in which Dr. Shapiro noted Davis had "very limited experience with competitive employment . . . did not succeed at several attempts at job training . . . [and] had a desire to work and please, but had very limited job finding skills." Shapiro Rep. 10. He stopped short, however, of finding the defendant significantly impaired in this area.

## C. Government Experts' Assessment of Davis' Adaptive Functioning

### 1. Dr. Jack Spector

Dr. Spector reviewed a number of records provided to him by the government, including but not limited to: excerpts of grand jury testimony; records from casinos; copies of cards and items from the defendant's wallet; bank statements; letters purportedly written by the defendant; and records from the PGCDC, including audio recordings and transcripts of telephone calls the defendant made while incarcerated there. Gov. Ex. 18. In addition, he reviewed the defense experts' reports, "some of the data supporting" those reports, "literature [he] believed was germane to the case," and conducted two interviews with the defendant. Spector Test. Vol. 1, 15. He also spoke with a detective working with the U.S. Attorney's Office on the case. Spector Test. Vol. 1, 15.

However, Dr. Spector did *not* speak with or interview any members of the defendant's

family, friends, teachers, or acquaintances in the community. He "was certain they would be unreliable . . . and chose to weigh the reports they provided to the defense's experts in this case with the information that could be gleaned from the objective record." Spector Test. Vol. 2, 37.

Although Dr. Spector administered a battery of tests to the defendant to assess his cognitive functioning and to detect poor effort or feigned intellectual impairment, he did not use *any* standardized adaptive functioning measures. In his opinion, because a number of ABAS-II items are not relevant to the daily life of someone who has been incarcerated for a number of years or are impossible to accomplish while in jail, use of the instrument would result in a downgraded score because the defendant simply does not have the opportunity to demonstrate skills that he very well may have. Next, he asserted that the ABAS-II is "susceptible to exaggerated or feigned deficit" and "susceptible to coaching by attorneys, advocates, family members, and other interested parties." Spector Rep. 5. Finally, he believed that the third-party respondents would have a vested interest in the outcome of the testing, and therefore be unreliable. Spector Test. Vol. 1, 68. For these reasons, Dr. Spector "dispensed" with the use of standardized adaptive functioning instruments, noting that there is no "absolute requirement" to do so in the DSM-IV-TR. Spector Rep. 4-5.

During his testimony, Dr. Spector made it clear that he was relying primarily on DSM-IV-TR diagnostic criteria, to the near-exclusion of AAMR criteria,[19] because he was more familiar with that text in his everyday practice. Spector Test. Vol. 1, 39. The Court finds particularly significant that, in preparation for his evaluation of the defendant in this case, Dr. Spector did not review, and had not read, the AAMR User's Guide 2007, and did not know who published it. Spector Test. Vol. 2, 19-20. Unlike the DSM-IV-TR or even the AAMR 2002 manual, the User's Guide directly addresses the unique challenges and modifications clinicians must make to their diagnostic protocol when conducting a retroactive assessment of a criminal defendant. Notably, Dr. Spector was the only expert involved with this case who had not reviewed this authoritative text, though he testified that believed he had read previous editions. Spector Test. Vol. 2, 20. To the best of the Court's knowledge, there have been no prior editions of the User's Guide.

_____

[19] Dr. Spector stated that he relied on secondary source summaries of the AAMR definition of mental retardation and did not "re-read the original source material with regard to those guidelines." Spector Test. Vol. 2, 13.

-36-

Dr. Spector testified that he has performed assessments of mental retardation in three previous criminal cases, but this was the first case in which the evaluation was for the purpose of eligibility for the death penalty. Spector Test. Vol. 1, 106-07.  In two of those cases, he concluded that the defendants' intellectual functioning was sufficiently high so as to preclude mental retardation, so additional evaluation for adaptive functioning was not required.  In the third case, he did perform an adaptive functioning evaluation and concluded that the defendant was mentally retarded. Notably, Dr. Spector was retained for the defense in that case, and both interviewed and administered the ABAS-I to the defendant's mother, though he claimed doing so was not "overly productive." Spector Test. Vol. 2, 6, 52.

Ultimately, in this case, Dr. Spector concluded that Davis was not significantly impaired in any of the ten domains in the DSM-IV-TR:

> Taken as a whole, and despite Defense's efforts to depict Mr. Davis as wholly disabled with respect to adaptive functioning, I find him to possess a wide range of strengths and competencies that by large margin fail to satisfy the AAIDD guidelines and DSM-IV-TR criteria with respect to the adaptive components of mental retardation.

Spector Rep. 14.

The number of red flags in Dr. Spector's report are numerous, and the Court will list just a few of them here. In the area of Communication, Dr. Spector stated that "Mr. Davis *is reported* to routinely read the newspaper" . . . and has written letters to friends incarcerated at other facilities." Spector Rep. 6 (emphasis added). There is no reference to the source of this report, and the claims seem to fly in the face of overwhelming historical evidence of Davis' functional illiteracy.  It also disregards the defendant's admission that he had others write the letters for him, which is consistent with the defense experts' conclusions that the language used in the letters was beyond the defendant's abilities. In the area of Functional Academics, Dr. Spector states that Davis is able to "calculate and use fractions" based on a recorded conversation in which he stated that 65% of a 30-year sentence, less 2-3 years for time served, would be 16 or 17 years.  There is no evidence that Davis conducted these calculations himself, as opposed to repeating what someone else had told him, nor is there any evidence that Davis is able to perform similar calculations on a regular or reliable

basis.

The Court finds highly suspect Dr. Spector's conclusion that Davis was not significantly impaired in *any* domain of adaptive behavior, especially functional academics, an area in which Dr. Shapiro, in contrast, concluded that the defendant's limitations were "profound." Shapiro Rep. 6. Furthermore, in his report, Dr. Spector attempted to refute the defense experts' conclusions almost exclusively with information drawn from the recordings of the defendant's jail calls and clearly focused on strengths and isolated occurrences, rather than weaknesses or typical functioning. The Court finds this analysis conclusory, unduly dismissive of the wealth of information contained in the voluminous historical records, and methodologically unsound.

Although Dr. Spector recognized that "the assessment of MR in the context of capital litigation is different from that in the community," Spector Test. Vol. 2, 23, his approach to the assessment was excessively rigid and he was unwilling to conduct any sort of evaluation that would be considered non-standard in a *clinical* setting. Accordingly, the Court rejects the conclusions of Dr. Spector as unsupported by the evidence and contrary to accepted practices in this field.

### 2. Dr. Sue Antell

Dr. Antell reviewed, in addition to the results of numerous psychological tests she administered, the reports of Drs. Nagele, Woods, Shapiro, Olley, and Spector, the same records the government provided to Dr. Spector, medical and case records, criminal records, affidavits from confidential informants, and transcripts of the defendant's phone calls. Antell Test. 9. She noted that evaluation of Davis' adaptive behavior presented a challenge because he has been incarcerated for the past four years. In her opinion, his girlfriend, mother, and daughter could not be considered unbiased observers, so she discounted their contributions to the defense experts' evaluations. Instead, she endeavored to focus her efforts on "deriving a picture of day-to-day activities based on the observations of others who are not emotionally involved with Mr. Davis, his own comments in response to questions about his activities," and her "clinical observations." Antell Rep. 14.

Dr. Antell further noted that the standardized tests of adaptive functioning were not developed for forensic purposes, because they are intended to be used with caregivers or other reporters who want to get a realistic, accurate estimate of the individual's present adaptive

functioning in order to develop an appropriate treatment plan. In the forensic context, instead of having an incentive to be as accurate as possible, she contended that the reporter may have reason to underreport skills or exaggerate deficits. Therefore, like Dr. Spector, Dr. Antell elected not to administer the ABAS-II to the defendant or any third parties. Antell Test. 38-39. With respect to Dr. Olley's ABAS-II results, she concluded that because the reporters were being asked to evaluate the defendant's behavior many years ago, the "scores have no validity." Antell Test. 53.

Dr. Antell did utilize a modified, or "back door," administration of the Vineland Adaptive Behavioral Scales in order to "estimate" the defendant's adaptive functioning. Antell Test. 39. She combined his answers to questions during their interview, the paper record, and her own clinical observations to compile answers on the Vineland. Antell Rep. 15. Though she admitted that this administration was non-standard (describing it as a "clinical administration"), she used it, in part, to arrive at her conclusion. Antell Test. 116.

Dr. Antell's current practice is about 60% litigation-related, with the rest clinical. A large part of her practice is being retained by defense attorneys in lead poisoning litigation; she has never been retained by a plaintiff in such a case. She is hired to give an opinion as to whether or not an individual has neurocognitive dysfunctions, and if so, whether those dysfunctions are appropriately attributable to lead exposure. In all cases that were brought to trial, she testified that the deficits were not attributable to the lead poisoning. Antell Test. 96-97.

From her review of the available records in this case, Dr. Antell concluded that the defendant was a "fully functioning, intellectually competent adult," *aside from assistance which may be required to compensate for his learning disabilities.* Antell Rep. 14 (emphasis added). As discussed above, the Court has concluded that the defendant does not suffer only from a learning disability. Therefore, this makes many of Dr. Antell's conclusions highly questionable. However, even aside from that fact, a number of her assertions seem hyperbolic.

For example, she listed a number of behaviors documented in the record that she categorized as "completely incompatible" with deficiencies in adaptive functioning sufficient to support a diagnosis of mental retardation. These include discussing the filing of a motion during one of the telephone calls, traveling long distances to go gambling, following the jail schedule and using its phone system. However, it is well-established that assessment of adaptive behavior focuses on

weaknesses, rather than strengths, and isolated achievements cannot "trump" broad deficits.

Dr. Antell's report includes sections entitled "History of the Current Charges" and "Prior Criminal History." Antell Rep. 4-5. In the latter section, Dr. Antell states that information from "multiple confidential informants" indicate that Davis was at least a mid-level drug trafficker and committed premeditated robberies of other drug dealers or persons he believed had cheated him. Most experts believe that some or all of this should not be considered in an assessment of adaptive functioning, and this view is reflected in the authoritative AAMR User's Guide. User's Guide at 22 ("Do not use past criminal behavior . . . to infer level of adaptive behavior or about having MR/ID."); *see also Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1345 (N.D. Ala. 2006) ("This court rejects the argument that willful and/or anti-social behavior excludes a mental retardation determination. To the contrary, it suggests that a person whose IQ tests strongly indicate mental retardation has not adapted."). The Court cannot discount the possibility that this information may have unnecessarily colored Dr. Antell's analysis. Indeed, she criticized Dr. Olley for failing to account for "what appears to have been a relatively successful 'career' in an underground or illegal economy, i.e. the drug trade." Antell Rep. 9.

Dr. Antell also seemed to display an exaggerated conception of the degree of impairment required to be diagnosed with mild mental retardation: "While a few individuals with MMR can live independently with close supervision, even these least affected individuals lack the capacity to manage most aspects of their lives." Antell Rep. 2. In contrast, Dr. Shapiro stressed that many persons with mental retardation can accomplish things that stereotypically are thought to be beyond their capabilities. For example, they can marry, have children, converse using multi-syllable words, have a checking account and/or credit card, have a driver's license, and commit crimes. Def. Ex. 2, presentation of Dr. Shapiro, at 11-12.

Dr. Antell's position also seems to conflict with the requirement that an individual only show significant impairment in either one of three broad categories, or two of ten more specific domains. By definition, then, persons with mental retardation can have the capacity to manage a number of areas of their lives. It is axiomatic to an understanding of mental retardation that weaknesses may coexist with strengths, as in any other individual. Dr. Antell appeared unwilling to accept this fundamental aspect of the definition of the disability.

Furthermore, Dr. Antell's reliance on her own clinical judgment to determine whether the defendant was mentally retarded, to the exclusion of a number of other potential sources of information, may have undermined the accuracy of her assessment. Stephen Greenspan and Harvey Switzky have recently advocated for the minimization of the importance of clinical judgment in making mental retardation evaluations in death penalty cases:

> To the extent that global perceptions are relevant in establishing a diagnosis of MR, they should be the perceptions of people who have known the individual well over a period of months or years and not those of a clinician who knows the individual superficially from one or two meetings, especially when that clinician has limited experience an training in the MR field.

Def. Ex. 26, Greenspan & Switzky, *Lessons from the Atkins Decision.*

The Court does not mean to question Dr. Antell's qualifications in the field of mental retardation. The fact remains, however, that in the context of forensic cases, where experts meet with the defendant only for a matter of hours, it appears unwise to eschew interviewing family, friends, neighbors, or others who may have a better sense of the defendant's functioning over time and in varying contexts. Accordingly, for the reasons noted above, the court rejects the conclusions of Dr. Antell.


D. Discussion and Conclusions

After careful review of all the documentary evidence and hearing testimony from all the expert and non-expert witnesses, the Court concludes that the defendant has amply satisfied his burden of showing, by a preponderance of the evidence, that he suffers from significant deficits in his adaptive functioning. Though some parts of the record are conflicting, the overwhelming weight of evidence demonstrates that the defendant's adaptive functioning deficits are severe and pervasive, and have been present throughout his life.

Specifically, the Court concludes that the defendant is significantly impaired in at least six of the ten domains in the DSM-IV-TR, and at least one of the three categories specified by the AAMR. The Court will now address each of the domains and the one category in which the defendant appears to be deficient.

*1) DSM-IV-TR Adaptive Functioning Domains*

a) Communication

A multitude of assessments, beginning in childhood, indicate that the defendant has severe language problems. He has consistently exhibited deficits in comprehension of verbal commands, expressive language deficits and low vocabulary skills. His niece and half-brother both noted that Davis sometimes had difficulty understanding their conversations or making himself understood. Without question, he has been functionally illiterate for many years, and remains so.

The government contends that Davis is not impaired in this area because it claims he is able to read the newspaper, on one occasion he read a poem or inspirational passage aloud on the phone, he is able to routinely place phone calls from the PGCDC, and he maintains reciprocal conversations of approximately 20 minutes in length. As discussed above, the Court discredits the reports of the defendant reading the newspaper in any depth[20], given that numerous tests and reports document a reading comprehension level comparable to a second or third-grade child. Importantly, this level of reading facility might allow him to read the limited passages he discusses on the telephone, or he may have been reciting or paraphrasing something someone read to him.

The defense experts reviewed either the recordings or transcripts of the jail calls and found the defendant's conversations "concrete" and lacking in conceptual thinking. "Concrete thinking" is a term of art in psychology and psychiatry. It means that one's mental processes are characterized by literalness and the tendency to be bound to the most immediate and obvious sense impressions, as well as by a lack of generalization and abstraction. Conversations with someone who is capable only of concrete thinking would consist predominantly of discussions of objects or events, with a distinct absence of concepts or generalizations.

As to this domain, the evidence is almost overwhelming that the defendant has substantial

---

[20] The jail recordings offer little support for the notion that the defendant is able to read. For example, in one of the calls, it appears that the defendant is trying to read a poem to his girlfriend. After a few sentences, he breaks off, stating "the shit be so long I ain't gonna read all that shit." He mispronounces the word "confidants." Moments later, the defendant tries to read a prayer, stumbles over a few phrases, and then gives up, saying, "Man, you messed me up 'Boo.' I can't read this shit right now." Gov. Ex. 3, Call #3361, at 2-3.

deficits in communication, and the Court so finds.

### b) Home-Living

The defendant has limited cooking abilities. He may be able to cook a grilled cheese or something in the microwave (if he only has to push one button), but he was unable to explain to Dr. Woods how to cook scrambled eggs beyond cracking an egg and putting it in a pan. Davis could shop at a grocery store, but only bought simple things he recognized, like chicken or ketchup. He has never lived by himself, always residing with his parents, wife, or girlfriends.[21] There was no evidence that he has ever demonstrated the ability to budget or keep a daily schedule. There are even some reports of him having difficulty navigating his own neighborhood as a child. Dr. Olley reported that reports of the defendant's home living skills were "uniformly low," with the exception of one former girlfriend, Necia Brown.

The government argues that the defendant is able to manage his personal finances (i.e., his commissary account) at the jail, that he has used money orders and debit cards in the past, opened bank accounts and used debit cards in his own name, and is able to remember whether a particular transaction is occurring under his own name or one of his aliases. He has lived outside his family home since he was a teenager and fathered three children with three different women. He can maintain more than one romantic relationship at a time without the women's knowledge and purchase items for his children.

The Court disagrees with the government and finds, by a preponderance of the evidence the defendant is, more likely than not, significantly impaired in this domain.

### c) Self-Direction

Self-direction refers to the extent to which an individual takes responsibility for himself, as opposed to relying on others for assistance with routine activities. The defendant has not worked

---

[21] The government presented the testimony of Arnold Litman, a former landlord who rented an apartment to the defendant for approximately 18 months, but his testimony was questionable and he did not have any basis to testify whether the defendant lived alone during that period.

systematically to achieve his goals and cannot tell time. His niece and daughter, Earlishia, both reported that the defendant relied on them extensively for help with reading, counting, remembering things, and using the bank.

The most that can be said for the defendant in this domain is that he does appear to decide when and how he wants to gamble, but this is a far cry from an overall sense of self-direction. He reportedly asserts himself when he is denied library privileges, and is able to use an alias or alternate identity when circumstances require it.

Accordingly, the Court finds the defendant to be significantly impaired in this domain.

### d) Functional Academics

The defendant is not literate or numerate. Despite multiple attempts at intervention and years of special education, he continues to display a profound deficit in this area. For example, he was unable to spell his older daughter's name, though he could pronounce it correctly. He informed Dr. Olley that he got other inmates to write letters for him, and that he found this embarrassing. During his interview with Dr. Woods, Davis could not repeat the months in order, consistently missing either September or October. He reported that he got a driver's license by having someone else take the test for him.

Starta Tillman stated that she worked with the defendant to teach him to count $20 bills, which he was eventually able to learn after a lengthy period of time. He was talented in music and played the trumpet well, but was unable to read the music. His elementary school music teacher remembered that she had to write the fingerings beneath each note so that he could play the piece.

In March 1987, when he was nearly 17 years old, his special education teacher at the Duke Ellington School administered end-of-year testing. On the Peabody Individual Achievement Test (PIAT), Davis demonstrated grade-level equivalent skills of 2.8 in spelling, 2.7 in reading comprehension, 2.4 in reading recognition, and 4.4 in mathematics. Notably, these scores had not improved appreciably from a PIAT administration five years earlier.

The government experts make few arguments in this area, other than to insist again that Davis reads newspapers, poems, and inspirational passages, which the Court has already discredited.

Again, the evidence before the Court on this issue is almost overwhelming, and it is clear that

the defendant is significantly impaired in this domain.

### e) Health and Safety

The defendant has not made use of preventative medical or dental care as an adult, and did not consistently manage his seizures when he was in the community. Starta Tillman reported that Davis had "staring seizures" about three times a week, but would not go to doctors and did not like to take his medication. The defendant was hit by vehicles multiple times as an adolescent. He was shot while in high school, and again in 2000. Davis admitted he was a poor driver and that he has had several accidents. Ms. Brown confirmed this, and stated she would not let him drive her car. Both raters on Dr. Olley's administration of the ABAS-II gave Davis scores of 4 in this domain, which is two standard deviations below the mean. The convergence of these ratings, by those who were familiar with Davis' typical behavior in the community — as opposed to a prison environment — is very persuasive.

The government argues that Davis is not functionally impaired in this domain because he actively seeks medical and dental treatment in jail, sought medical treatment for himself when he was shot in 2000, and reportedly discussed his "radiating" back pain with a guard at the jail. At the PGCDC, Davis goes to the gym regularly and performs an exercise routine.

The defendant's use of medical services while in jail tells the Court little about how he would utilize similar services in the wider community. One of the correctional officers testified that she instructed Davis to put in a sick slip when he complained of back pain; it is unclear whether Davis would have done so on his own initiative. Likewise, with the gunshot wound, Dr. Woods stated that there is not enough information about how Davis came to the decision to go to the hospital to draw a general conclusion, and that seeking treatment for something as serious as a gunshot wound is elementary enough that persons with MMR could perform that act.

The Court finds the defendant to be significantly impaired in this domain.

### f) Work

The defendant is 38 years old, but has extremely limited experience with competitive employment. He once worked for three months at the John Akridge Company performing routine

custodial duties, but left because he claimed he was unable to complete tasks that required reading, such as filling out forms. A senior engineer at the company informed Dr. Olley that no reading was required beyond punching a time clock and filling out a time sheet every two weeks.

In 1992, he briefly attended job training at the Kennedy Institute in Washington, D.C. where he was learning custodial tasks, but did not complete the program. Necia Brown reported that Davis worked at his uncle's garage doing body work on cars, but the uncle did not confirm this when he was contacted by Dr. Woods. The defendant displayed little job-finding skills, and seemed to rely on friends and family to locate jobs for him. As a child, the defendant had a paper route, but both his parents and brother reported that he needed help from his brother to complete it, because he could not reliably remember where the papers should be delivered.

The government contends that the defendant was able to manage a mid-level drug operation. However, he reported to Dr. Olley that he brought drugs in large quantities, and resold it without breaking it down into smaller packages so as to simplify the calculations for himself. He reported that he always had someone with him, particularly when drug dealing or gambling, to read and count for him so that he would not be cheated. Dr. Spector argued that the defendant was not significantly impaired in the area of work because he has held some maintenance and janitorial positions, performs duties well as a detailee within the jail, and has "reportedly sold drugs and engaged in other illegal activities for money." Dr. Spector also questioned his motivation to seek civilian employment.

First, the Court heard from several witnesses that custodial and janitorial positions are the type of rote tasks that can be mastered by those with mild mental retardation. Second, the AAMR User's Guide instructs clinicians not to consider past criminal behavior as evidence of ability in a functional domain. In a sense, a life of drug dealing could be interpreted as a failure to adapt to the requirements and responsibilities of legal, mainstream employment. Finally, adaptive functioning is not evaluated on the basis of whether an individual *could* have done something if he wanted to, but rather whether he actually *performed* that activity with any consistency or regularity. Accordingly, Dr. Spector's speculation regarding the defendant's motivations are inapposite.

The Court finds the defendant to be significantly impaired in this domain.

Under the DSM-IV-TR a significant limitation in adaptive functioning in at least two of the ten domains is required for a diagnosis of mental retardation. Here, the Court finds significant

limitations in at least six domains.

### 2. AAMR Adaptive Behavior Categories

Of the three broad adaptive categories in the AAMR 2002, the Court finds that the defendant is significantly impaired in the area of conceptual skills. This category incorporates, *inter alia*, receptive and expressive language, reading and writing, money concepts, and self-direction.

As discussed previously, the defendant has severe language and learning deficits that were noticed in early childhood, and grew more marked as he fell further behind his peers. All the Court's findings described above in the domains of Communication, Functional Academics, and Self-Direction are applicable to the analysis of the defendant's skills in this category. It is clear that Davis has profound deficits in conceptual skills, and this fully satisfies the AAMR definition of mental retardation that requires significant limitation in only one of the three categories.

## III. Onset Before Age 18

The final prong of the mental retardation definition was the least contested. The real dispute between the parties was whether the defendant's deficits were indicative of mental retardation, or instead attributable to a severe learning disability. It is abundantly clear to the Court that whatever ails the defendant, the ailment began well before he turned 18.[22] Therefore, the defendant has abundantly carried his burden of proving by a preponderance of the evidence that his condition manifested itself before he became an adult, and the final element is satisfied.

## Part 3: Conclusion

In the final analysis, there can be no real contest as to two out of three elements required for a finding of mental retardation. The parties are in agreement that whatever condition the defendant has, it is of long-standing origin and predates the age of 18. As to intellectual capacity, the defendant

---

[22] Dr. Spector initially testified on direct examination that he believed that the definition required that the individual be *diagnosed* before age 18, but on cross examination admitted that he was mistaken, because the DSM-IV-TR requires *onset* before age 18, but not *diagnosis*. Spector Test. Vol. 1, 54, 76.

has a well-documented and consistent history of intellectual functioning that brings him within the heartland of mild mental retardation. His full scale IQ scores have consistently been within the established range for mild mental retardation (taking into account the standard error of measurement), even without application of the Flynn effect.

The real battleground has been on the question of adaptive functioning and here, the defense has the better argument — indeed, a far better argument. At the beginning of the hearing on this matter, the Court instructed the parties that at the conclusion of the testimony they should be prepared to address the Eleventh Circuit's recent decision in *Holladay v. Allen*, 555 F.3d 1346 (11th Cir. 2009), as it pertains to the facts of this case. In *Holladay*, the Eleventh Circuit affirmed the district court's determination that the defendant, Holladay, had mental retardation, based in part upon its finding that he was significantly impaired in five domains of adaptive functioning: communication, social skills, community use, functional academics, and work. This Court finds the court's opinion in *Holladay*, as well as the preceding district court opinion, very instructive because of the large number of parallels between the adaptive functioning of Holladay and Davis.

Like Davis, Holladay had severe academic deficits and learning difficulties, but had developed means to get around his illiteracy. In particular, it was noted that Holladay obtained assistance from others to do whatever reading and writing was necessary, and that he used landmarks for directions. The record in this case reveals that Davis used similar techniques to compensate for his own illiteracy.

With regard to the domain of work, like Davis, Holladay had an extremely sparse employment history, most of his jobs having been menial and arranged for him by others, which included pumping gas, loading trucks, stacking boxes, picking up trash, and assisting his father with painting. *Id.* at 1359. The longest that Holladay held a job was nine months. *Id.* In the present case, Davis also has had a few menial, mostly custodial jobs that friends and family were able to arrange for him, none of which lasted longer than a few months.

There was no credible evidence that Holladay was capable of living independently. During most of his adulthood, he moved between his parents' home and those of his wives, relying on them for support. He did not appear to have any responsibilities for maintaining a home or that he had those skills. Similarly, there was no credible evidence that Davis ever lived independently, always

living with parents, friends, or girlfriends so that he would have someone to help him with the daily living tasks of which he was not capable.

Importantly, like Davis, Holladay had a long history of criminal behavior. Holladay had been arrested for assault and battery, a number of sexual offenses, burglary, kidnaping, and various firearms charges before the murders for which he was sentenced to death. With regard to the events surrounding those murders, one expert testified that Holladay had engaged in "very purposeful, deliberate action." During crime sprees, Holladay was able to elude law enforcement, travel around several states, use an alias, and avoid certain topics when being interrogated by police officers. 555 F.3d at 1360-61. However, the district court "reject[ed] the argument that willful and/or anti-social behavior excludes a mental retardation determination. To the contrary, it suggests that a person whose IQ tests strongly indicated mental retardation has not adapted." *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1346 (N.D. Ala. 2006). The Court agrees with this observation and finds that the defendant's alleged criminal acts and enterprises do not preclude a holding that Davis is mentally retarded.

The district court in *Holladay* credited the defense expert more than the prosecution expert in part because the defense expert conducted a conducted a far more extensive interview with the defendant and interviewed many more people before forming her opinion. The circuit court pointed out that the government's expert "selected a much narrower range of subjects with whom to speak about Holladay's conduct as an adult, focusing primarily on law enforcement and an obviously hostile ex-wife," and made no attempt to quantify the defendant's adaptive behavior. 555 F.3d at 1362. The government expert also failed to administer an IQ test to Holladay, stating that it was her standard practice not to do so if she could determine from interviews and record review that the individual's adaptive functioning was above the level of mental retardation. *Id.* at 1363.

This Court rejects the opinions of Drs. Spector and Antell in this case for similar reasons. By far, the defense experts used a broader and more comprehensive basis of information in the formulation of their opinions, and did not dispense with attempts to quantify adaptive functioning simply because some of the sources may be less than ideal. While the government experts were entitled to consider documents provided by the government, particularly the jail recordings, they failed to temper those sources with those provided by the defense, and by other sources of

information readily available to, but eschewed by, them.[23]  On the whole, although all the experts were adequately qualified to opine whether the defendant was mentally retarded, the Court found the defense experts to be more reliable, more thoughtful, and more dispassionate.  Thus, the Court has little difficulty in concluding that the defendant has met his burden of establishing by a preponderance of the evidence that he is mentally retarded, and the Court so finds.

This is not a case in which an issue has been generated by the defense out of thin air; rather, it is a defense that has been raised based upon by a long and well-documented history of the defendant's condition.  The Federal Death Penalty Act and the Eighth Amendment preclude the machinery of death from turning when a defendant is mentally retarded.  Here, the Court concludes that the defendant has met his burden of establishing his mental retardation, and thus the cogs in the machine must come to a halt.

Date: April 24, 2009

Roger W. Titus
United States District Judge

---

[23] The government experts also spent an inordinate amount of time attacking the credentials and conclusions of other experts, rather than focusing on conducting a thoughtful, thorough, and independent evaluation of the defendant.