# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**THE UNITED STATES OF AMERICA**　　　*

　　　　　　　　　　　　　　　　　　　*

　　　　　v.　　　　　　　　　　　　　*

　　　　　　　　　　　　　　　　　　　*　　Criminal Case No. RWT 07-0199

**EARL WHITTLEY DAVIS**　　　　　　　*

　　　　　　　　　　　　　　　　　　　*

　　　　　　　　　　　　　　　　　　　*

## <u>MEMORANDUM OPINION</u>

On June 3, 2009, a jury convicted the Defendant, Earl Whittley Davis, on six counts related to the robbery and murder of Jason Schwindler on August 4, 2004.  At trial, a large portion of the Government's case against Davis consisted of demonstrating that he was, to a reasonable degree of scientific certainty, the source of DNA deposited on three pieces of evidence recovered from the crime scene.  Davis is currently awaiting sentencing.

Prior to trial, Davis moved to suppress DNA evidence obtained in violation of the Fourth Amendment [Paper No. 29], arguing that his DNA profile had been obtained by police and entered into a local law enforcement database unconstitutionally. The Court conducted a hearing on the motion to suppress on September 15, 2008.  At the conclusion of the hearing, the Court indicated that it would not make an immediate disposition of Defendant's motion, and that the parties should continue preparing for trial.

The Court now issues this memorandum opinion and accompanying order denying the Defendant's motion.

# I. FACTUAL BACKGROUND

## A. The Acquisition of Davis' DNA Profile

Jason Schwindler was murdered on August 4, 2004, but the series of events serving as the basis for the Defendant's motion to suppress actually began nearly four years earlier.

On August 29, 2000, Davis was admitted to Howard County General Hospital with a gunshot wound to his right leg. Davis told hospital staff that he was a victim who had been shot during the course of a robbery. As required by law, the hospital notified the Howard County Police Department that it was treating a gunshot victim. *See* Md. Code Ann. Health-Gen. § 20-703. Detective Joseph King of the Howard County Police Department, then a uniformed patrol officer, was the first to respond to the hospital and speak with Davis concerning the circumstances of the shooting. Detective King testified that when he arrived at the hospital, he located Davis in the emergency room laying on a bed or gurney. Detective King observed Davis' gunshot wound and secured Davis' pants and boxer shorts, which had been removed by hospital personnel, placed in a bag, and stored on a shelf beneath the bed. Detective King considered the clothing to be evidence of the crime reported, *i.e.*, Davis' shooting. A short time later, Lieutenant Steven Lampe also responded to the hospital. Lieutenant Lampe retrieved the seized clothing from Detective King and submitted it to the property room to be held as evidence.

Because Detective King and Lieutenant Lampe believed that Davis was being uncooperative with their investigation[1], officers located the vehicle in which Davis' friend had driven him to the

---

[1] Indeed, Davis even admitted himself to the hospital under an assumed name, presenting officers with a District of Columbia driver's license bearing his picture and the name "Gary Edmonds." He was later identified through fingerprints as Earl Whittley Davis, and admitted that this was his true name.

hospital, and requested a K-9 officer to do a scan of the car. The dog positively alerted to the presence of a controlled dangerous substance ("CDS", *i.e.*, illegal drugs), and the car was subsequently searched. A small amount of marijuana was found in the vehicle, and Davis was consequently arrested upon his release from the hospital. The marijuana charges were later dropped.

The investigation into Davis' shooting concluded without an arrest, and the case was considered closed as of November 7, 2000. To that point, no forensic testing had been conducted on the bloody clothing seized from Davis at the hospital. Davis was not contacted or otherwise advised that the shooting investigation was being terminated.

The following year, in June 2001, an individual named Michael Neal was murdered in Prince George's County. In April 2004, Lieutenant Lampe was contacted by members of the Prince George's County Police Department ("PGCPD"), who asked him questions about the arrest of Earl Davis in 2000. The PGCPD officers specifically asked whether any property had been seized from Davis that might have his DNA on it. Lieutenant Lampe understood from this inquiry that Davis was now a suspect in an unrelated homicide. Later that month, Sergeant Jeff Reichert and Detective K. Jernigan of the PGCPD homicide unit, who were familiar with the facts of the Neal murder, went to the Howard County Police Department to recover Davis' clothing for potential DNA testing. Lieutenant Lampe released the clothing to Detective Jernigan, who signed the property form for the items on April 29, 2004. On the property form for the clothing, Davis was clearly identified as a "victim."

Shortly thereafter, in or around June 2004, Davis' DNA profile was extracted from the blood stains on his clothing and compared to an unknown sample recovered from the scene of the Neal homicide. The samples did not match, and Davis was therefore excluded as the source of

evidentiary sample from the Neal murder.  Subsequently, Davis' DNA profile was placed in the local Prince George's County DNA database.

**B. The Jason Schwindler Murder**

On August 6, 2004, shortly before 1:00 p.m., Jason Schwindler, an armored car employee, picked up a bank deposit from a local business and took it to a nearby BB&T bank in Hyattsville, Maryland.  As Schwindler walked up to the bank entrance, two gunman exited a Jeep Cherokee and began shooting at Schwindler, killing him.  When their escape in the Jeep was thwarted by the armored truck driver, the assailants carjacked a bank customer and fled in her vehicle.  The carjacked vehicle was later recovered.

After the murder, officers from the Prince George's County Police Department responded to the crime scene and collected evidence.  Numerous items were recovered, including a baseball cap worn by one of the shooters, two firearms, and steering wheel covers from a Jeep Cherokee and a Pontiac Grand Am that were used by the suspects in the commission of the offense.  These items were swabbed and analyzed for DNA.  The  DNA profiles of the major contributor to the DNA found in the ballcap and on the trigger and grip of the recovered firearms were entered into the local CODIS[2] database. As a result of a search of the local database, on or about August 14, 2004, there was a "hit" between the DNA found on the baseball cap recovered at the scene and the DNA of the Defendant.  Law enforcement officers were notified of the match and advised to obtain a known

_____

[2] CODIS refers to the Combined DNA Index System, which is an automated DNA information processing and telecommunications system that supports the National DNA Index System (NDIS), State DNA Index (SDIS), and local DNA Index (LDIS).  CODIS contains DNA profiles from convicted offenders and crime scene evidence and is used as an investigative tool to identify suspects by comparing DNA profiles.  *See* http://www.fbi.gov/hq/lab/html/codis1.htm (last visited September 9, 2009).

sample from the Defendant.   Pursuant to a search warrant, a DNA sample was taken from him and compared to the items recovered from the crime scene.   The DNA analyst concluded that, to a reasonable degree of scientific certainty, Davis was the source of the DNA recovered from three pieces of evidence related to the Schwindler murder: (1) the steering wheel of the stolen Jeep Cherokee the assailants drove to the bank, (2) a baseball cap dropped by one of the assailants during the course of the robbery, and (3) the steering wheel of the Pontiac Grand Am in which the assailants fled the scene.

After a number of pretrial proceedings, Davis' trial began on May 5, 2008.  The trial lasted five weeks, at the conclusion of which he was convicted on all counts. He is currently awaiting sentencing.

## II. ANALYSIS

Defendant moves the Court to suppress DNA evidence arising from prior interactions with Prince George's County and Howard County police.  He argues that there were at least three separate Fourth Amendment violations leading to the "cold hit" match that implicated him in the Schwindler murder. First, he alleges that the initial seizure of his clothing without a warrant was unlawful, rendering all further uses of evidence derived therefrom inadmissible as fruit of the poisonous tree. Second, he claims that the extraction of his DNA profile from his clothing without a warrant was a separate violation of the Fourth Amendment, Finally, he argues that  the retention of his DNA profile in the local CODIS database constituted yet another Fourth Amendment violation.

The Government bears the burden of proving, by a preponderance, the legality of the search and seizure of evidence which it intends to introduce at trial. *See Nix v. Williams*, 467 U.S. 431, 444

5

(1984); *United States v. Mendenhall*, 446 U.S. 544 (1980).

**A. Initial Seizure of Defendant's Clothing at Howard County General Hospital**

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. A warrantless seizure is "*per se* unreasonable . . . subject to only a few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). The government bears the burden of establishing that the circumstances of a warrantless search or seizure bring it within an exception to the warrant requirement. *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). It is undisputed that Davis' clothing was seized from his hospital room without a warrant. Therefore, the seizure was unreasonable unless justified by an established warrant exception.

As the Supreme Court explained in *United States v. Jacobson*, the Fourth Amendment

protects two types of expectations, one involving "searches," the other "seizures."
A "search" occurs when an expectation of privacy that society is prepared to
consider reasonable is infringed. A "seizure" of property occurs when there is
some meaningful interference with an individual's possessory interests in that
property.

*United States v. Jacobsen*, 466 U.S. 109, 112 (1984). Therefore, to challenge a *search*, a defendant must demonstrate that he had a reasonable expectation of privacy in the premises or property searched. *See Rakas v. Illinois*, 439 U.S. 128 (1978). However, to challenge a *seizure*, a defendant need only establish that the seizure interfered with his constitutionally protected possessory interests. The infringement of privacy rights, while often a precursor to a seizure of property, is not necessary to such challenge. *See United States v. Padilla*, 508 U.S. 77 (1993). Defendant argues that the warrantless seizure of his clothing was illegal because he retained a possessory interest in his

clothing while in his hospital room.  The Government counters that the seizure was justified under either the "plain view" or "inevitable discovery" exceptions to the warrant requirement.

1. <u>Defendant Retained A Possessory Interest In His Clothing While Hospitalized</u>

Courts consistently recognize that a hospital patient retains a possessory interest in his or her clothing, even if the clothing has been taken by hospital personnel and stored elsewhere for safekeeping.  *See, e.g.*, *United States v. Neely*, 345 F.3d 366, 369 (5th Cir. 2003); *Jones v. State*, 648 So. 2d 669, 675 (Fla. 1994) ("even if we were to find that Jones' privacy interests were in no way compromised, there clearly was a meaningful interference with his constitutionally protected possessory rights when his effects were seized without a warrant").  Therefore, even if Davis no longer had a privacy interest in the outer appearance of his bloodied pants and boxers once he presented himself for medical treatment, there is no evidence in the record that Davis ever relinquished his *possessory* interest in the clothing that was bagged and placed underneath his bed for him.  *See Neely*, 345 F.3d at 368-69 (finding that district court erred in focusing on whether shooting victim had privacy interest in clothing at time police seized them from hospital because privacy interest is pertinent to constitutionality of searches, not seizures); *accord People v. Jordan*, 468 N.W.2d 294 (Mich. 1991); *People v. Hayes*, 154 Misc.2d 429 (N.Y. Sup. Ct. 1992); *Commonwealth v. Silo*, 389 A.2d 62 (Pa. 1978); *Morris v. Commonwealth*, 157 S.E.2d 191 (Va. 1967).

Warrantless seizures of personal property are generally considered unreasonable under the Fourth Amendment unless there is probable cause to believe the property is or contains contraband or evidence of a crime *and* the seizure falls within an established exception to the warrant requirement.  *See United States v. Place*, 462 U.S. 696 (1983).  The Government has argued that the

seizure of Davis' clothing is justified under the plain view exception, or in the alternative, the inevitable discovery doctrine. The Court will address these arguments sequentially, along with one other potential exception that the Court raised *sua sponte* during the evidentiary hearing.

2. <u>Plain View Doctrine</u>

The "plain view" doctrine is an exception to the warrant requirement that permits law enforcement to seize objects if (1) the officer is lawfully present in the location where the observation is made, (2) the officer has lawful access to the item, and (3) the object's incriminating nature is immediately apparent. *United States v. Wells,* 98 F.3d 808, 809-10 (4th Cir. 1996). The Government contends that Detective King was lawfully present in Davis' hospital room to investigate the nature of his shooting, and that he had lawful access to the clothing in plain view on the shelf below Davis' bed. Thus, the Government argues that the clothes were properly subject to seizure as evidence of Davis' shooting – *i.e.*, the crime of which Davis was a *victim*. The Defendant argues that the plain view doctrine does not apply because the bloody clothing was not "incriminating evidence," since Davis was a victim of a crime, and not himself suspected of any criminal activity.[3]

In this case, the first two requirements of the plain view doctrine are clearly met. Although a hospital patient retains some level of privacy in a hospital emergency room, it is much less than that enjoyed in one's home. Detective King did not need a warrant to enter the hospital's emergency room, and in fact was there on official business, investigating a shooting. Thus, he was lawfully present. In addition, Detective King had direct, lawful access to the storage area beneath Davis' bed

---

[3]Davis was later suspected of, and arrested for, marijuana possession, but the Government does not contend that the clothing would have been evidence of that offense.

where the bag of clothing had been placed. *C.f. Neely*, 345 F.3d at 371 (plain view doctrine did not apply because officer did not have lawful right of access to hospital property storage room, and patient/suspect's clothing could only be seized by asking medical personnel to retrieve it); *State v. Lopez*, 476 S.E.2d 227, 230 (W. Va. 1996) (plain view doctrine did not apply to patient's clothing stored out of view at nurses' station, turned over to police upon request).

The more difficult prong of the plain view analysis, as applied to the facts of this case, is whether it was "imminently apparent" that the bag beneath Davis' hospital bed contained something of an incriminating nature. In general, plain view doctrine may support the warrantless seizure of a container believed to contain evidence or contraband, but any subsequent search of the concealed contents of the container must be done pursuant to a warrant or another warrant exception. *See United States v. Williams*, 41 F.3d 192, 197 (4th Cir. 1996). However, the Fourth Circuit has held that a seizure *and search* of a container is supported by the plain view doctrine when "the contents of a seized container are a foregone conclusion." *Id*. The court reasoned that "when a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *Id.* (quoting *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992)). The circumstances under which an officer finds the container may add to the apparent nature of its contents. *Id.* (finding that it was a foregone conclusion that brick-shaped packages wrapped in cellophane and brown paper, found inside suitcase along with dirty blankets and towels, contained drugs); *see also United States v. Blair*, 665 F.2d 500, 507 (4th Cir. 1981) (upholding warrantless search of closed bales of marijuana based on circumstances under which they were found, including another bale that had split open, and the presence of loose marijuana scattered on top of the bales). For example, "when

a person opens a Hershey bar, it is a foregone conclusion that there is chocolate inside." *Williams*, 41 F.3d at198. *See also United States v. Eschweiler*, 745 F.2d 435, 440 (7th Cir. 1984) (police could lawfully open envelope that clearly indicated it contained key); *United States v. Morgan*, 744 F.2d 1215, 1222 (6th Cir. 1984) (police could open bottle where label on bottle made it apparent that bottle contained contraband).

The "foregone conclusion" rationale cannot apply when the outward appearance of the container is ambiguous.  For example, in *United States v. Donnes*, the Tenth Circuit found a warrantless search of an opaque, black leather camera lens case not justified under the plain view doctrine even though the case was discovered next to a syringe inside a glove. 947 F.2d 1430. Proximity to a suspicious item alone does not make it a foregone conclusion that a closed container also contains evidence or contraband.  *See also United States v. Bonitz*, 826 F.2d at 956 (hard plastic case did not obviously reveal its contents to be a firearm even though found in proximity to soft-sided gun cases).

The factual circumstances of the seizure of Davis's clothing were explored at the evidentiary hearing.  There was no testimony as to whether the bag was open or closed, or whether it was transparent, opaque, or somewhere in-between. However, the Court finds that Detective King was justified in believing that it was a foregone conclusion that the bag (of whatever sort) beneath Davis' hospital bed would contain Davis' clothing, and that his clothing would have blood on it.  At the hearing, the Government introduced a photograph of Davis from approximately the shoulders down, lying on a hospital bed or gurney. (Gov't Hr'g Ex. 2.)  Detective King testified that this photo accurately depicted what Davis was wearing when Detective King observed him.  In the photo, Davis is wearing a black tee shirt but no pants or underwear.  His genital area is covered by a sheet,

but the photo clearly shows that he has a gunshot wound high on his upper right thigh, an area that certainly would normally be covered by pants, and probably by boxer shorts as well. The sheet covering his lap area is bloody, as is the sheet under Davis' right leg, presumably where the wound was still bleeding.  Detective King testified that as of 2000, the Howard County hospital had been on his "beat" for about two years, and he had responded on prior occasions for individuals there with gunshot wounds. (Tr. of Motions Hr'g at 63, September 15, 2008) (hereinafter, "Hr'g Tr.").  He testified that he knew that the hospital's practice was to secure any property taken from a victim, such as clothing, and place it under the patient's bed, often in a bag. (Hr'g Tr. 71.)  At the evidentiary hearing, Detective King was also shown a white plastic bag with the printed lettering "Patient's Belonging Bag" and blank spaces for the patient's name and room number. (Def.'s Hr'g Ex. 1.)  He stated that while he could not recall the exact appearance of the bag that contained Davis' clothing, he had seen bags similar to that one used at Howard County General Hospital on other occasions.  (Hr'g Tr. 72.)

Under the totality of the circumstances, taking into account Detective King's experience with the hospital's practices regarding patients' property, the appearance of the Defendant at the time Detective King spoke with him, and the obvious fact that the Defendant had been shot in an area of the body usually covered by clothing, the Court concludes that it was a foregone conclusion that the bag underneath Davis' bed would contain his clothing, and that the clothing would constitute evidence of the shooting (*i.e.*, blood stains and bullet holes).  Therefore, the seizure was justified under the plain view exception, and reasonable under the Fourth Amendment.

The holding of the Supreme Court of Florida in *People v. Jones*, 648 So.2d 669 (Fla. 1994), is not to the contrary, though the facts of *Jones* are at least superficially similar to those presented

here.   In *Jones*, a police officer questioning Jones in his hospital room seized the bag of the defendant's clothing that had been placed in the corner of the room. As in this case, Jones was conscious and alert, but had been uncooperative with the officer. *Id.* at 673. The Florida court held that the seizure of the bag was not justified under the plain view doctrine because the incriminating character of the clothing in the bag was not immediately apparent.

However, there are a number of critical factual distinctions between *Jones* and the present case that illustrate why Davis' clothing can be considered in plain view, whereas Jones' clothing was not.   In *Jones*, the defendant was hospitalized after an auto accident.   The owner of the truck Jones had been driving at the time of the accident was missing, and police had reports that Jones and the missing man had been seen together the day before. At the time that officers questioned Jones in his hospital room, approximately a day after the accident, police had only a suspicion that a crime had occurred at all.   *Jones*, 648 So.2d at 678. It could not, then, be "immediately apparent" that the defendant's clothing was evidence of a crime when police had no substantial evidence that any foul play was involved. The officer stated that he seized the clothing "because, from his experience, he believed that evidence taken from Jones' clothing might assist in the search for the missing man." *Id.* at 674.   In fact, when the missing man was later found dead in a local pond, it was only at that point that soil and pollen samples were taken from the clothing that had been seized from Jones' hospital room.   *Id.* at 672.   Thus, "the probative value of the clothing did not become apparent until it was examined by an expert and the 'mud' was detected on Jones' shoes and pants." *Id.* at 678. The court concluded that the officer's "suspicion clearly was insufficient to justify the type of seizure that occurred." *Id.*

In the present case, it was obvious from the Defendant's appearance that a crime had

occurred; the gunshot wound in his leg was clearly visible.  Whereas Jones was only suspected of perhaps being involved in a man's disappearance, Davis was positively the victim of a violent crime. Furthermore, in Jones, the evidentiary value of the clothing seized was only apparent after an expert forensic soil analysis.  In this case, the blood on the pants and the bullet hole through them made their probative value immediately apparent.

Defendant argued at the evidentiary hearing that it was "not clear" how a bullet hole and blood stains on his pants could be incriminating, as opposed to "forensic evidence which would perhaps incriminate a third party in the shooting and robbery. . . ." (Hr'g Tr. 110.)  He further argued that the pants would not add anything to a potential prosecution, because the fact of the shooting was not in dispute, and could be proven with medical records. (Hr'g Tr. 110-111.)  The Court disagrees. The pants, complete with bullet hole and bloodstains, could certainly be introduced at trial if someone were charged with Davis' shooting.  Nor would they necessarily be overly cumulative evidence.  As the Government argued:

> That evidence could have been used if they had found the location of the crime to prove where the crime occurred by associating the blood on the pants with any blood found at a potential homicide scene. And certainly with an uncooperative victim, they could be used to establish, along with the medical reports, the gunshot injury.

(Hr'g Tr. 142-143.)  In sum, the Court finds that bloody clothing displaying a bullet hole has sufficient evidentiary value, without the necessity of further forensic analysis, so as to bring it within the scope of the plain view doctrine.

Defendant also argued that the Court should not hold that the plain view doctrine justified the seizure of Davis' clothing because at the time of the seizure, Davis was a victim, not a suspect. He interprets the final prong of the plain view doctrine as requiring that the incriminating nature of

the item must be not only immediately apparent, but also tend to incriminate the person from whom it is seized, rather than some third party.  The Court has been unable to find any authority, and the Defendant has provided none, to support this additional requirement.  This may be due to the unique situation presented by the facts of this case; very rarely will a victim from whom evidence is seized later become a criminal defendant with standing and reason to challenge the previous seizure.  As a matter of first impression, however, it would seem unwise and overly restrictive to require police to know who will be incriminated by an item in plain view before they are able to seize it and investigate further.

In conclusion, although there are some distinct factual differences between the instant case and a "typical" plain view seizure, the Court concludes that under the totality of the circumstances the seizure was reasonable, and not in violation of the Fourth Amendment.  Under the Fourth Circuit's interpretation of the "immediately apparent" prong of the test, it was reasonable for Detective King to believe it was a "foregone conclusion" that the bag underneath Davis' hospital bed contained the clothing he was wearing when he was shot, and that the clothing would have evidentiary value.  Therefore, the seizure was lawful.

3. Inevitable Discovery

The Government also argues that even if the plain view doctrine does not apply, the seizure is also justified under the doctrine of inevitable discovery.  This doctrine applies when the prosecution can establish "by a preponderance of the evidence that the information ultimately or inevitably *would* have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984) (emphasis added); *United States v. Thomas*, 955 F.2d 207 (4th Cir. 1992). The Government argues that Davis' clothing inevitably would have been seized as part of a search incident to his arrest for

marijuana possession upon his release from the hospital.  The Government contends that Davis would have had his pants and undershorts with him at the time of his arrest, and therefore they inevitably would have been seized at that time as evidence of the shooting.

To uphold the seizure of the clothing on this basis, the Court must find, by a preponderance of the evidence, that Davis would have had the clothes on his person or in an area within his immediate control at the time of his arrest. *See Chimel v. California*, 395 U.S. 752 (1969); *c.f. Neely*, 345 F.3d at 371 (seizure of bloody clothing not justified as incident to arrest when clothing located in a different area of the hospital than where defendant was arrested).

Lieutenant Lampe testified that Davis was released directly into his custody upon his discharge from the hospital in the early afternoon. (Hr'g Tr. 84.)  Davis wore pants provided to him by hospital staff. (Hr'g Tr. 85.)  Lieutenant  Lampe stated that if Davis had been carrying his hospital bag with his pants and undershorts in it, his clothing would have been seized at the time of his booking, as evidence of the shooting and alleged robbery. (Hr'g Tr. 86.)

The Government's argument is highly speculative.  Had they not already been seized, Davis *may* have had the bloody clothes with him when he left the hospital, but it is just as likely he would have thrown them away or sent them home with a family member or friend before he was discharged and arrested.   Because the Government has failed to show that recovery of the clothing was inevitable, as opposed to merely probable, the Court will not rest its holding on this ground.

4. Implied Consent

At the hearing on the motion, the Court and the parties made several inquiries of the witnesses regarding the possibility that Davis may have consented to the seizure of his clothing. Detective King testified that upon entering Davis' hospital room, he immediately seized the bag of

clothing from underneath Davis' bed because "[t]hey were considered evidence of the crime that was reported, the shooting." (Hr'g Tr. 66.) Although Detective King had a brief conversation with Davis concerning the circumstances of his shooting, Detective King stated he had no discussion with respect to the bag of clothing he had seized. (Hr'g Tr. 73.)  While Detective King was in the room, Davis was conscious and sitting up in bed.  Detective King testified that he "assumed" Davis was aware that he was taking the bag of clothing because Davis "was up. He was watching me. I was right next to him." (Hr'g Tr. 75.) However, Detective King did not affirmatively tell Davis that he was taking the clothing as evidence; nor did Davis affirmatively object to Detective King taking the clothing.  Lieutenant Steven Lampe, who arrived to speak with Davis after Detective King had already taken Davis's clothing, testified that during his conversation with Davis in his hospital room, Davis never asked for his pants back.  Nor did he complain about the seizure when he was forced to wear pants provided by the hospital upon his discharge, nor did Davis contact the police department at any time after the incident to request the return of his property.  However, Lieutenant Lampe also admitted that Davis never gave express consent to the seizure of his clothes. (Hr'g Tr. 95.)

Although the Government did not argue in its opposition to Defendant's motion that the seizure could be justified by consent, the Court raised the possibility at the evidentiary hearing:

> How about under the totality of the circumstances one can imply consent? . . . Most victims want the crime to be prosecuted successfully.  Most victims are going to want to make certain that the police have at their disposal the evidence necessary to find the person who committed the crime; and most victims, when they have something that's their own and that obviously has evidentiary value, don't say a word when the police take it. How do you differentiate that from this case?

(Hr'g Tr. 164.)

16

Defense counsel responded, in part

> No matter how meritorious or salutary the reasons for taking that clothing are, the government still has the burden to obtain consent or make sure that it falls within one of the exceptions to the warrant requirement.

(Hr'g Tr. 165.)

Defense counsel argued strenuously that it would be improper to place the burden on Davis to demonstrate that he did not consent by affirmatively objecting, and whether he passively acquiesced to the seizure of his clothing should not be dispositive of the legality of the police conduct. (*See, e.g.* Hr'g Tr. 115.)  Further, the defense argued that "[i]t's pure speculation about whether Mr. Davis saw the clothes being seized and whether he ever had an opportunity to protest. I think this highlights why it's impermissible to put the burden on Mr. Davis." (Hr'g Tr. 158.) Defendant appears to be correct on this point.

In *Bumper v. North Carolina*, the Supreme Court held that when the government seeks to justify a search by consent, it bears the burden of proving that the consent was freely and voluntarily given.  391 U.S. 543, 548-49 (1968).  The Court elaborated that this "burden cannot be discharged by showing no more than acquiesce to a claim of lawful authority." *Id.*  The validity of consent is determined by an analysis of the totality of the circumstances.  Since *Bumper*, numerous other courts have agreed that "if the police simply proceed to make the search without first asking for permission, it cannot be said that 'implied consent' arises from the lack of objection; 'for constitutional purposes nonresistance may not be equated with consent.'" Wayne R. LaFave, 4 Search and Seizure: A Treatise On the Fourth Amendment § 8.2(b), at 61 (4th ed. 2004) (quoting *United States v. Most*, 876 F.2d 191, 199 (D.C. Cir. 1989) (store employees' cooperation did not amount to implied consent to search defendant's bag when there was no evidence that officers

requested permission before search)); *see also United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996); *United States v. Gonzales*, 71 F.3d 819 (11th Cir. 1996); *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir. 1985) ("consent cannot be presumed from the absence of proof that a person resisted police authority or proof that the person merely acquiesced"); *State v. Kudron*, 816 P.2d 567, 571 (Okla. Crim. App. 1991) (rejecting claim "that silence in the face of a request to search or a defendant's failure to expressly object to a search is evidence of consent" and noting that the "trier of fact should be slow in finding intentional and voluntary relinquishment of immunity from search without a warrant when from the evidence the matter is somewhat in doubt").

In *Jaras*, the defendant was the passenger in a car stopped by police. The officer asked the driver's permission to search the vehicle, including the trunk. The trunk contained a garment bag and two suitcases. The driver stated that the suitcases belonged to Jaras, not him. At the officer's instruction, Jaras walked to the rear of the vehicle and watched as the officer searched the garmet bag, and then the suitcases, which contained a large amount of marijuana. The officer did not ask Jaras whether he could search the luggage, and Jaras was not present when the driver gave his consent to the search, nor was there any evidence in the record that Jaras heard the officer ask for permission at all. 86 F.3d at 390. The court then concluded that "[w]e do not think that consent may reasonably be implied from Jaras's silence or failure to object because Officer Mitchell did not expressly or impliedly ask for his consent to search." *Id.*

On this record, therefore, the Court cannot conclude that Davis consented to the seizure of his clothing. Although it seems logical that if he had objected, he would have said something to the officers, the Fourth Amendment requires something more than that. It is undisputed that Detective King was in uniform when he entered Davis' hospital room, and that he did not ask permission to

remove the bag of clothing. Even assuming *arguendo* that Davis was aware of Detective King's actions, his silence during the seizure and later as he was transported from the hospital to jail wearing borrowed pants is not sufficient to imply consent.

5. Conclusion As To the Initial Seizure

For all of the above reasons, the Court concludes that the seizure of Davis' clothing while he was a patient at the Howard County General Hospital was lawful pursuant to the plain view exception to the warrant requirement. The Court rejects, however, the Government's alternative reliance on the inevitable discovery exception, and also finds that the seizure could not be justified by either express or implied consent.

**B. Extraction and Chemical Analysis of DNA from Davis' Clothing By Prince George's County Police Department**

Having concluded that the initial seizure of Davis' pants and boxer shorts was lawful, however, does not end the inquiry. The Court must proceed to determine whether the warrantless extraction of Davis' blood from the clothing and its subsequent DNA analysis violated the Fourth Amendment. "[I]t is clear that the Fourth Amendment law pertaining to the collection of DNA from private persons, neither convicted nor arrested for a crime, is unsettled." Laura A. Matejik, DNA Sampling: Privacy and Police Investigation In A Suspect Society, 61 Ark. L. Rev. 53, 77 (2008).

Presumptively, the extraction of blood from Davis' clothing and the subsequent chemical analysis of his DNA profile are both searches subject to scrutiny under the Fourth Amendment. The Supreme Court has held that the government's use of scientific technology to reveal information that is not visible to the naked eye or routinely exposed to the public constitutes a search. *See United*

*States v. Kyllo*, 533 U.S. 27, 40 (2001) (use of a thermal imager, a device not in general public use, to detect details of the interior of a home that otherwise would have remained unknowable without a physical intrusion constituted a search that is presumptively unreasonable without a warrant); *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989) (chemical analysis of blood for presence of drugs is a search); *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (scraping dried blood from underneath suspect's fingernails is search because it goes "beyond mere physical characteristics . . . constantly exposed to the public . . . [and] constitutes the type of severe, though brief, intrusion upon cherished personal security that is subject to constitutional scrutiny").

The more difficult question is whether Davis retained a sufficiently expectation of privacy in the chemical composition of his blood such that the warrantless searches were consequently unreasonable.  To determine whether Davis retained a reasonable expectation of privacy in the identifying DNA characteristics in his blood, the Court must determine whether Davis' situation is more akin to that of an arrestee or convicted felon, or an ordinary citizen. Police authority to test for DNA is controlled by the degree to which its source retains a privacy interest in its identifying characteristics.

1. Davis' Expectation of Privacy In His DNA Present On the Seized Clothing

Fourth Amendment protections extend only to those items in which the individual has both a subjective and objectively reasonable expectation of privacy.  *Rakas v. Illinois*, 439 U.S. 128 (1978).  The Government argues that the Court need not apply a Fourth Amendment analysis to the extraction of Davis' DNA profile from the bloodstains on his clothing because Davis never expressed any subjective expectation of privacy in his clothing after they were seized, nor did he retain an objectively reasonable expectation of privacy after that point.  It contends that an individual

does not retain an objectively reasonable expectation of privacy in evidentiary items that are lawfully in police custody and/or that have been abandoned.

*(a) Subjective Expectation of Privacy*

The Government first contends that Davis did not demonstrate a subjective expectation of privacy in his pants and boxers after their seizure because he never requested that they be returned to him.  It points out that the marijuana charges against him were dismissed, and then insinuates that Davis has failed to reassert his expectation of privacy by requesting the return of his property at that time. But, since the clothing was seized as evidence of the *shooting*, and had nothing to do with the marijuana charges against Davis, this argument is questionable.  It is uncontested that no one had been apprehended for the shooting at the time the charges against Davis were dropped (nor since), so Davis probably would not have been entitled to the return of his clothing, in any event.  The Court is unconvinced that a person in Davis' situation should be required to make a formal, but fruitless, request for the return of property that has been seized as evidence in order to maintain an ongoing privacy interest in that item.  Testimony at the hearing established that Davis was not informed when the investigation into his shooting was closed, nor was he informed when detectives from Prince George's County requested access to his items for DNA testing. Under these circumstances, the Court hesitates to rest the entire Fourth Amendment analysis of this chain of events on Davis' failure to show interest in retrieving a bloody pair of pants with a bullet hole.

Furthermore, the more important inquiry is not whether Davis had a subjective privacy interest in the outward appearance of the clothing, or even the fact that he had bled on the clothing, but specifically whether he had such an interest in the chemical composition of his DNA molecules. Courts addressing whether DNA analysis comports with the Fourth Amendment in other contexts

21

seem to operate on the premise that individuals *always* have a *subjective* expectation of privacy in their DNA, unless and until a DNA sample is taken from them, with their knowledge, for law enforcement purposes.  *See* discussion of DNA database cases, *infra* section II.C.1.  These courts then proceed to determine whether such an expectation is *objectively reasonable*, given the status of the individual who is the source of the DNA, and the reason for which it is being tested.

For these reasons, the Court will presume that Davis did have a subjective expectation of privacy in his DNA, and will instead focus its analysis on whether society would recognize this expectation as objectively reasonable.

### (b) Objective Expectation of Privacy

The Government offers two potential reasons why the Court should find that Davis no longer had an objectively reasonable expectation of privacy in his DNA at the time it was tested in 2004. First, it argues that a defendant does not have any expectation of privacy in clothing that was previously lawfully seized, and that items already in police custody may be subjected to scientific examination and testing without a warrant. In the alternative, it contends that due to the passage of forty-four months between the seizure and the DNA analysis, Davis had effectively abandoned his property, thus extinguishing any objective privacy interest.

### (i) Scientific Testing of Items Lawfully Within Police Custody

The Government relies on *United States v. Edwards*, 415 U.S. 800 (1974), for the proposition that a defendant does not have an expectation of privacy in clothing that was lawfully seized and held by authorities and that such clothing may be subjected to scientific testing and examination without a warrant.  In *Edwards*, the defendant was arrested at around 11:00 p.m. for the attempted breaking and entering of a post office. The next morning (about ten hours later), police purchased

a change of clothes for the defendant and seized, as potential evidence, the clothing he had been wearing at the time of his arrest.  Later testing of the defendant's clothes revealed the presence of paint chips matching the samples that had been taken from the window that had been tampered with at the post office. *Id.* at 801-02.  The defendant argued that because his clothing was not seized contemporaneously with his arrest, police were required to secure a warrant before they could be seized later and subjected to a search for evidence.

The Court ruled that the search and seizure of Edwards' clothing had not violated the Fourth Amendment. It reasoned that the confiscation of a defendant's clothing is a normal incident of custodial arrest, and "[r]easonable delay in effectuating [the seizure] does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." *Id.* at 805.  Further, the court stated that there was no question that "clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis [and] that the test results are admissible at trial." *Id.* at 803-04.  Extrapolating from these two premises, the court held that "once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may be lawfully searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other." *Id.* at 807.

There is some support for the Government's position, as a number of other courts have held that *detainees* have no reasonable or legitimate expectation of privacy in effects being lawfully held by the police.  *See, e.g., United States v. Lester*, 647 F.2d 869, 874-75 (8th Cir. 1981) (clothing

seized pursuant to arrest for detoxification lawfully tested by different police agency when defendant became suspected of murder); *Wallace v. State*, 816 A.2d 883, 897 (Md. 2003) (defendant whose visibly stained clothing was seized pursuant to arrest on unrelated drug charge had no reasonable expectation of privacy that would prevent police from moving clothing to different property room and examining it ten days later in furtherance of murder investigation); *Wilson v. State*, 752 A.2d 1250 (Md. Ct. Spec. App. 2000) (police not required to seek warrant to re-test rape suspect's blood sample that had been seized seven years earlier pursuant to a warrant during investigation for unrelated rape); *Oles v. State*, 993 S.W.2d 103, 107-11 (Tex. Crim. 1999) (after defendant arrested pursuant to arrest warrant on motion to revoke probation, no reasonable expectation of privacy in clothing seized at time of arrest, so testing eight days later for blood that was not visible to naked eye not a Fourth Amendment violation); *Williams v. Commonwealth*, 527 S.E.2d 131, 135-36 (Va. 2000) (seizure and testing of defendant's boots in murder case was proper as defendant had no expectation of privacy which society would recognize as reasonable in items that had been lawfully seized and inventoried at time of his arrest and incarceration on unrelated charge).

To summarize, in the Government's view, if an item is already within lawful police custody, that ends the inquiry. It argues that any such item may later be examined or tested, without a warrant, without violating the Fourth Amendment.  Although this is true in many contexts, given typical facts, the analysis is overly simplistic.  The crucial question is not only the legality of the initial seizure, but rather whether the owner or source of the item retains a reasonable privacy interest, even when the seizure was lawful.

For that reason, it must be stressed that there is a crucial factual distinction between this case and the cases discussed above.  In *Edwards* and like cases, the item being examined lawfully entered

police custody in one of two ways: Either it was seized pursuant to the defendant's lawful arrest and subsequent detention, or it was previously seized pursuant to a warrant supported by probable cause. However, when Davis' clothing came into police custody, his status was that of a *victim*, with the same undiminished privacy rights as any other citizen, and his clothing was seized for its potential use as evidence against an unknown third party. It is without question that those arrested for and convicted of crimes have diminished privacy interests, and this understanding underlies the foundation of the holding in *Edwards* and like cases.

While it is logical that an accused would no longer have a reasonable expectation of privacy in his own possessions that have been lawfully taken into police custody, it is far less clear that a *victim* also loses the expectation of privacy in his or her genetic material that may be present on evidentiary items. Taken to its logical extreme, the application of *Edwards* and its progeny to the instant case would mean that any citizen whose blood finds its way into lawful police custody as a result of victimization (*e.g.*, child abuse, sexual assault and domestic violence victims, etc.), would then lose any expectation of privacy in the DNA markers in that blood, which could be used against him or her at a later date without the constitutional safeguard that a warrant supported by probable cause first be issued.

For example, imagine a perfectly law-abiding individual whose car is struck by a drunk driver, resulting in a horrific accident. At the hospital, the victim's clothing is removed and taken into police custody as evidence of the degree of the injuries caused by the drunk driver. It is unlikely that the innocent party in this scenario would be comfortable knowing that for the rest of his life, should the police ever wish to have access to his DNA, they are relieved of the obligation to seek a warrant, which would otherwise exist. Instead, it is much more probable that the average

victims of car accidents, sexual assaults, child abuse, or other violent offenses would expect their clothing to be used in the investigation of that incident, but not that as a result of their misfortune the government will gain permanent, unfettered access to their genetic material. The Court is simply not prepared to declare that this is not an expectation of privacy that society is prepared to recognize as reasonable.

At least one circuit has expressed hesitancy to blindly apply *Edwards* to every situation involving DNA analysis: "[I]t may be time to reexamine the proposition that an individual no longer has any expectation of privacy in information seized by the government so long as the government has obtained that information lawfully. . . . In short, there may be a persuasive argument on different facts that an individual retains an expectation of privacy in the future uses of his or her DNA profile." *United States v. Weikert*, 504 F.3d 1, 16-17 (1st Cir. 2007).

The unique facts of this case present such an argument. Therefore, the Court is hesitant to find that *Edwards* controls here. This does not mean, of course, that the search was necessarily unreasonable (and therefore unlawful), but it does indicate the wisdom of extending Fourth Amendment protection to Davis and others who might someday find themselves in a similar position.

(ii) Abandonment

At the hearing on the motion, the Court explored the Government's contention that Davis had demonstrated no interest in retrieving his clothing during the forty-four months between their seizure and subsequent analysis, raising the question of whether under these circumstances the clothing and/or blood could be considered abandoned property, akin to garbage.

It is well established that the warrantless search of abandoned property is not unreasonable

26

and therefore does not violate the Fourth Amendment. *See, e.g., California v. Greenwood*, 486 U.S. 35 (1988) (no reasonable expectation of privacy in bagged garbage placed on curb outside curtilage of home for municipal collection); *United States v. Hoey*, 983 F.2d 890 (8th Cir. 1993) (finding apartment abandoned where renter told landlord she was leaving, was behind in rent, and had conducted moving sale).   The determination of whether property is abandoned is based on an objective analysis of act and intent.   *See Hoey*, 983 F.2d at 892.   "Intent may be inferred from words spoken, acts done, and other objective facts, and all the relevant circumstances at the time of the alleged abandonment should be considered." *Id.* Furthermore, for Fourth Amendment purposes, abandonment is not to be evaluated in the strict property-right sense,[4] but rather by determining whether an individual "has relinquished her reasonable expectation of privacy so that the search and seizure is valid." *Id.* at 892-93; *see also* 1 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.6(c), at 691 (4th ed. 2004) ("A justified expectation of privacy may exist as to items which have been abandoned in the property law sense, just as it is true that no such expectation may exist on some occasions even through the property has not been abandoned. This is because under *Katz* the question is not whether there has been abandonment in the property law sense, . . . but rather whether there has been abandonment of a reasonable expectation of privacy as to the area searched or the property seized.") (internal quotation marks omitted).

There are several problems with the argument that the extraction and analysis of Davis' DNA in 2004 was justified because Davis had abandoned his clothing. First, this Court has been unable

---

[4] "In the law of property, the question . . . is whether the owner has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully assert his superior interest." *City of St. Paul v. Vaughn*, 237 N.W.2d 365 (Minn. 1975).

to find a single case holding that an item can take on the character of abandoned property *after* the item already has been seized and placed in police custody. Rather, it is the individual's words or actions demonstrating an intent to abandon that justifies the search or seizure in the first place. The Government has not contended that Davis abandoned his clothing or his blood at the time that the clothing was seized at the hospital in 2000. Rather, it argues that when the blood stains were tested for DNA, over three years later, the Court should consider the clothing abandoned because Davis never affirmatively asked for it to be returned in the intervening time. This would indicate that *any* property that remains in police custody for a certain, unspecified amount of time, without objection, will ultimately be considered abandoned, such that the Fourth Amendment will no longer apply. The Court is reluctant to find that important constitutional rights are amenable to this type of passive waiver.

Second, abandonment is a problematic concept when applied to DNA because it implies a volitional act of relinquishment that is absent in this case. As one recent commentator has framed the issue: "Do we intend to renounce our actual expectations of privacy with respect to genetic material when we shed our DNA? *The volition that is implied in abandonment is simply unrealistic here.*" Elizabeth E. Joh, Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy, 100 Nw. U. L. Rev. 857, 867 (2006) (emphasis added).

Nonetheless, the abandonment analysis in *Greenwood* has been applied to uphold against Fourth Amendment challenge "covert involuntary DNA sampling," a process in which police collect DNA – not from crime scenes – but from known persons who are suspected of crimes, for whom police do not have probable cause to seek a warrant to take a sample directly from them. Joh, Reclaiming "Abandoned" DNA, at 882 (coining new term for this investigative technique to

eliminate the implication of volition when DNA is shed without one's knowledge or consent). Thus, instead of taking a sample directly from the targeted individual's body, which would clearly implicate the Fourth Amendment, police obtain discarded, or "abandoned" items that are likely to contain the target's DNA, such as cigarette butts, coffee cups, or chewing gum. *See, e.g., Commonwealth v. Bly*, 862 N.E.2d 341, 356-57 (Mass. 2007) (suspect connected to murder by DNA analysis of water bottle and cigarette butts he left behind after interview with police); *State v. Wickline*, 440 N.W.2d 249, 253 (Neb. 1989) (police not required to obtain warrant to test cigarettes defendant left at police station because he "abandoned these items and sufficiently exposed them to the officer and the public to defeat his claim to fourth amendment protection"); *State v. Athan*, 158 P.3d 27 (Wash. 2007) (no constitutional violation where police addressed phony class-action mailing to suspect in cold rape case and obtained suspect's DNA from saliva on return envelope: "The analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment.").

However, some commentators have questioned whether DNA can usefully or appropriately be analogized to trash. "[D]epositing DNA in the ordinary course of life when drinking, sneezing, or shedding hair, dandruff, or other cells differs from placing papers in a container on the street to be collected as garbage. Depositing paper in the trash is generally a volitional act. . . . Leaving a trail of DNA, however, is not a conscious activity." Edward J. Imwinkelried, <u>DNA Typing: Emerging or Neglected Issues</u>, 76 Wash. L. Rev. 413, 437 (2001).

In this case, there is not even the nominal volitional act that is present in "covert involuntary DNA sampling" cases. In those situations, it could be argued that by spitting out gum, discarding a disposable coffee cup, or throwing away a used tissue, the individual has actively demonstrated

an intent to abandon the item, and, necessarily, any DNA that may be contained thereon.  Here, Davis never discarded or otherwise abandoned the clothing from which the police later extracted his DNA profile; they were seized by police as evidence of his shooting. Nor did he voluntarily expel the blood that stained the clothing – one can hardly argue that the bleeding that results from a gunshot wound is a volitional act.  The Court does not believe that intent to abandon or volition can be inferred from passive inaction, particularly when Davis was never informed that the investigation into his shooting had been closed, which might have presented him with a logical opportunity to make a request for return of his property.  Therefore, considering Davis' blood and/or clothing to have been abandoned in order to justify the warrantless search of Davis' DNA profile is not appropriate.

Nor does the Court necessarily agree that conscious disposal of an item, or unconscious shedding of hair, saliva, or dermal cells, reasonably supports the conclusion that an individual has manifested an intent to abandon one's privacy interest in the information that can be gleaned from that item or tissue by DNA analysis.

> [W]hile Fourth Amendment law may not appear to protect a privacy interest in the *human tissue* left behind as the detritus of our daily lives, it is far from obvious that people do not harbor a privacy expectation in *genetic information* that "society is prepared to recognize as reasonable."  While it may be difficult to sympathize with the offenders who are convicted as a result of their shed saliva, few of us would characterize our own genetic information as lacking any protection in these circumstances.

Joh, <u>Reclaiming "Abandoned" DNA</u>, at 882-83 (emphasis added).  A colorable argument could certainly be made that a reasonable societal expectation exists that law enforcement officials will not follow individuals around, waiting for an opportunity to collect and analyze their DNA without their knowledge or consent. "The public is extremely concerned with preserving genetic privacy."

Imwinkelried, <u>DNA Typing</u>, at 438.

This finding would not, as the Government argues, require the police to seek a warrant in order to analyze any items recovered from a crime scene for DNA evidence. No one would argue, for example, that a rapist retains a reasonable expectation of privacy in the DNA contained in the semen that he leaves on his victim. Society considers it reasonable that if one has committed a crime, any evidence one leaves behind while doing so is fair game; the intentional, volitional act of committing the crime itself supports the theory that the criminal intends to abandon any privacy interest he has in his blood, fluid, cells, etc. that he may leave behind at the crime scene. Furthermore, the very fact that a given area is a crime scene changes the balance of interests relevant to a Fourth Amendment analysis of crime scene evidence.

Davis' situation is different. Police were in possession of clothing they had seized from a victim, and his status as such was clearly indicated on the property form. He simply cannot be considered to have voluntarily relinquished his privacy interest in his DNA in the same way that the perpetrator of a crime necessarily has. If the Fourth Amendment is held not to apply to so-called "abandoned" DNA, then courts will essentially be ignoring the difference between offenders and the general public. *See* Joh, <u>Reclaiming "Abandoned" DNA</u> at 880.

> It may be that we are already moving toward a system in which the government will have access to the genetic information of everyone in the population, which will be used to solve crimes ranging from murders to littering. If we want unrestricted government access to DNA information, however, that ought to be the subject of public debate rather than made possible through means such as analogizing DNA to trash. Without meaningful consideration of abandoned DNA, we lose the ability to protect our genetic information.

*Id.* at 883.

For these reasons, the Court concludes that Davis *did* retain some degree of privacy interest

31

in his DNA at the time it was extracted from his clothing during the investigation of the Neal murder. The next question, then, is whether the search was reasonable.

2. Whether DNA Analysis Was Reasonable Under Totality of the Circumstances

Prior courts have evaluated the Fourth Amendment compliance of DNA analysis under either the special needs doctrine, or under a totality of the circumstances balancing test. The "special needs" doctrine, first identified by the Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring), states that a warrantless search may nonetheless be reasonable under the Fourth Amendment if the search is in furtherance of an important and legitimate societal interest other than the general interest in law enforcement. In addition, the special needs must "make the warrant and probable-cause requirement impracticable." *Id.* The special needs doctrine has been used to authorize administrative searches, drug testing for student-athletes, and driver checkpoints to intercept illegal aliens, protect the public safety by identifying drunk drivers, or to solicit information from the public about a recent crime in the area.

However, the governmental interest in this case cannot be characterized as anything other than an ordinary interest in law enforcement. The police suspected that Davis may have been involved in the Neal murder, and wished to obtain his DNA profile as potential evidence that could be used to solve that specific crime. Therefore, the special needs doctrine does not apply.

Nor can the extraction and analysis of Davis' DNA profile be considered suspicionless, as are most special needs searches. Although the record is not developed as to what evidence police had at the time regarding Davis' potential involvement in the Neal murder, police interest had been directed at him to a degree such that the police thought it prudent to check with another jurisdiction to see if Howard County might be in possession of something with Davis' DNA on it. The Court

32

does not have enough information before it to determine what that level of suspicion was – at the time, the police could have possessed probable cause, reasonable suspicion, or simply a mere hunch about Davis' involvement.

Therefore, the Court will proceed to analyze the search of Davis' DNA under the totality of the circumstances test. The Supreme Court has recently approved the use of such an approach to determine the reasonableness of a search when the targeted individual has a diminished expectation of privacy. *See Samson v. California*, 547 U.S. 843 (2006) (suspicionless search of parolees pursuant to written condition of parole); *United States v. Knights*, 534 U.S. 112 (2001) (search of parolee's home pursuant to same written condition, paired with individualized suspicion). Reasonableness "is determined by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 118-19.

*a) Davis' Privacy Interest*

The degree of privacy interest that Davis retained in his DNA is difficult to determine with precision. His unique circumstances defy neat placement into any previously analyzed category of persons. Certain aspects of this case would indicate that Davis had a somewhat diminished expectation of privacy, as compared with an average citizen. First, he had actual knowledge that police were in possession of his blood, as he was aware that his bloody clothing had been seized after he was shot. In this day and age, where DNA testing is referenced almost daily in the news and on popular television series such as "CSI" and "NCIS," this certainly should have put Davis on notice that his DNA *could* someday be tested. In addition, the DNA testing performed by the Prince George's County Police Department did not entail any further bodily intrusion upon Davis, however

33

slight.  Several courts have held that when DNA can be obtained without forcible compulsion (as in the "involuntary covert DNA sampling" situation), the intrusion upon one's privacy interest is slight or nonexistent.

On the other hand, any diminishment in Davis' privacy interest in his DNA in this case could only have resulted as a consequence of his own victimization. It is far from clear whether society would recognize that outcome as reasonable. Certainly, Davis should have a greater degree of privacy than someone who had been arrested, convicted, or otherwise compelled to give a sample of his DNA.  There had been no communication between the police and Davis in over three years with regard to his seized clothing, and no forensic testing had been done on the clothing in connection with the investigation into Davis' shooting.

b) Government's Interest In Solving Crime

It should go without saying that the government has a powerful and compelling interest in apprehending and prosecuting those who have committed violent crimes.  And, in many circumstances, DNA evidence provides law enforcement with a powerful tool for solving crimes that might otherwise be unsolvable, often many years, or even decades, after the crime had been committed.[5]  At the time that police extracted Davis' DNA profile in April 2004, they were investigating the murder of Micheal Neal, which had taken place nearly three years earlier, in June of 2001.  Although Davis' DNA turned out not to be a match to the evidence taken from the Neal crime scene, it is hard to fault the police for following an investigative lead that may have allowed them to solve this "cold case."

---

[5] It can also be a powerful tool for vindication of those who have been wrongfully convicted. *See, e.g., District Attorney's Office for the Third Judicial District v. Osborn*, 129 S. Ct. 2308 (2009).

However, courts must be careful to avoid the temptation to conclude too quickly that this objective trumps any privacy interest an individual may have. As the Chief Judge of the Court of Appeals of Maryland has stated with respect to the Maryland DNA Collection Act:

> Undoubtedly, there are many crime fighting tools that, if allowed to be used, without restraint or with minimal oversight and unrestrained by the Fourth Amendment, would prove quite effective in detecting and solving crime, yet would wreak havoc with constitutional rights, even of inmates. It is for that reason that throughout the history of the Fourth Amendment, considerable efforts have been made to strike a balance between the State's law enforcement goals and the constitutional rights of the individual citizen. Surely the framers wanted law enforcement to operate in an effective and efficient manner; however, they were wise enough not to adopt a "by any means necessary" stance. In fact, the means and limitations which law enforcement utilized to enforce the law did not, and do not, "just matter," they became, and remain, key to any well-thought-out legal analysis and correct exposition of the law regarding the Fourth Amendment.

*State v. Raines*, 857 A.2d 19, 64 (Md. 2004) (Bell, C.J., dissenting) (citations omitted).

 c) *Balancing of the Interests*

Indiscriminate searches and seizures conducted under the authority of "general warrants" were the immediate evils that motivated the framing and adoption of the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 585 (1980).  Thus, one of the strongest policies underlying the warrant requirement is to prevent the government from exercising its search and seizure powers arbitrarily or to harass.  The requirement that a neutral magistrate stand between the police and the citizenry is a crucial check on the arbitrary exercise of government power:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police

35

officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (footnotes omitted).

Decades after *Johnson,* the Supreme Court reiterated:

Thus the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative. The burden is on those seeking the exemption to show the need for it. In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or extravagant to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won – by legal and constitutional means in England, and by revolution on this continent – a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important.

*Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (footnotes omitted).

Given the many reasons that warrantless searches are disfavored, the Court believes that the best practice in situations like the one presented by the case *sub judice* would be to seek a warrant before performing a DNA search on a sample from a victim-turned-suspect. Davis' clothing had been in police custody for over three years at the time it was tested, so any slight delay incidental to the warrant application process would have been inconsequential, and police cannot claim any particular exigency that would excuse the necessity for a warrant. In addition, the proposition that police could selectively target Davis as a suspect and test his DNA – a search that would require a warrant supported by probable cause were the police not in fortuitous preexisting possession of a sample – without the intervention of a neutral magistrate gives the Court pause.

36

That being said, although it is a relatively close call, under the totality of the circumstances, the Court finds that the extraction of Davis' DNA profile for comparison with the evidentiary sample from the Neal murder was reasonable.  The compelling government interest in potentially identifying the perpetrator in an ongoing homicide investigation outweighs the somewhat diminished privacy interests in his DNA that Davis retained.  Therefore, the extraction of Davis' DNA from his clothing was a lawful search under the Fourth Amendment.

However, the extraction of a DNA sample, based on individualized suspicion, for comparison with a specific crime scene specimen is a very different proposition from the indefinite retention of that profile in a DNA database after the initial comparison is complete.  The Court will now turn to the concerns specific to placement of Davis' sample in the database.

### C. Inclusion of Davis' DNA Profile in Local CODIS Database

Defendant argues that even if the Prince George's County police were justified in seizing and testing his DNA material in 2004, his profile should not have been maintained in a database after Davis was eliminated as a suspect in the Neal homicide.  Therefore, he argues that the "cold hit" match between his DNA in the database and DNA obtained from the scene of the Schwindler murder should be suppressed.

1. Governmental and Privacy Interests Implicated By The Retention of DNA Profiles In A Database

The central question animating this analysis is: What degree of privacy does an ordinary citizen retain in the identifying properties of his or her DNA?  Courts that have addressed this question have almost uniformly done so in the context of Fourth Amendment challenges to state and federal laws that require those who have been convicted of crimes, or are on probation, parole, or

supervised release, to submit a DNA sample for inclusion in a government database. Although Davis' DNA was not placed in the Prince George's County database pursuant to such a law, the Court has nonetheless found these cases illustrative, particularly in their discussion of the relative strengths of the governmental and individual privacy interests implicated.

All federal circuits to have addressed the issue have upheld the constitutionality of such acts. The majority have done so under the totality of the circumstances analysis described in *Knights* and *Samson*. *See United States v. Weikert*, 504 F.3d 1 (1st Cir. 2007) (federal DNA act); *United States v. Kraklio*, 451 F.3d 922, 924 (8th Cir.2006) (federal DNA Act); *Johnson v. Quander*, 440 F.3d 489, 496 (D.C. Cir. 2006) (federal DNA Act); *United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir.2005) (federal DNA Act); *Padgett v. Donald*, 401 F.3d 1273, 1280 (11th Cir. 2005) (Georgia analog); *United States v. Kincade*, 379 F.3d 813, 832 (9th Cir.2004) (en banc) (federal DNA Act); *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411, 413-14 (5th Cir. 2004) (per curiam) (federal DNA Act); *Jones v. Murray*, 962 F.2d 302, 306-07 (4th Cir.1992) (Virginia analog). Three circuits apply the special needs analysis. *See Amerson*, 483 F.3d 73, 79 n.6 (2d Cir.2007) (federal DNA Act); *United States v. Hook*, 471 F.3d 766, 773 (7th Cir. 2006) (federal DNA Act); *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003) (federal DNA Act). Finally, the Sixth Circuit, in *United States v. Conley*, 453 F.3d 674, 679-81 (6th Cir.2006), held that the DNA Act was constitutional under either a totality of the circumstances or a special needs analysis.

Those circuits applying the special needs analysis have upheld the statutes based on the government's special need to have an accurate record of offenders' identities, reduce recidivism, and/or solve *future* crimes that someday may be committed by offenders who are released, all of which were found to be distinguishable from the general interest in law enforcement. *See Amerson*,

483 F.3d at 81 (primary purpose of DNA database is "to assist in solving crimes should the investigations of such crimes permit resort to DNA testing of evidence," but at the time of collection the samples provide no evidence of criminal wrongdoing and are not sought for the investigation of a specific crime) (quoting *Nicholas v. Goord*, 430 F.3d 652, 668-69 (2d Cir. 2005)); *Hook*, 471 F.3d at 773 (special need of federal DNA act is to establish a database of accurate felon identification information and to deter recidivism, not to search for information on a specific crime or to detect "ordinary criminal wrongdoing"); *Kimler*, 335 F.3d at 1142 ("desire to build a DNA database goes beyond the ordinary law enforcement need").

Clearly, the special needs doctrine cannot apply to the circumstances under which Davis' DNA profile was analyzed. In this case, the primary purpose of the Prince George's County Police Department *was* to further the investigation of a specific crime, and was intended to detect if Davis had engaged in a specific act of "ordinary criminal wrongdoing." The addition of his profile to the local CODIS database seems to have been at most a secondary goal, and perhaps simply an afterthought. Therefore, the Court concludes that it should apply the totality of the circumstances test to the facts of this case, keeping in mind that in the context of DNA, "analysis of the privacy interests at stake is highly context dependent." *Amerson*, 483 F.3d at 87.

*a) Privacy Concerns Regarding DNA Databases*

In addition to the more general privacy concerns regarding one's genetic information that were discussed in section II.B.1, *supra*, there is an additional level of privacy implications when that information is retained in a DNA database. There are two separate recognized privacy interests at stake for persons subject to compulsory DNA sampling pursuant to statute. The first is the physical intrusion necessary to collect the sample, typically by blood draw or buccal swab. This bodily-

integrity aspect of the privacy calculus is not applicable in Davis' case because police were already in possession of his bloody clothing, and the extraction of his DNA profile involved no further search of his person.  However, this distinction is not of great moment, because many courts have recognized that the intrusion inherent in the drawing of blood or the swabbing of one's mouth is "minimal." *Nicholas v. Goord*, 430 F.3d 652, 669 (2d Cir. 2005). *See also, e.g., Weikert*, 504 F.3d at 12 ("the blood draw is neither a significant nor an unusual intrusion").

The second, and far more significant, intrusion is the analysis and maintenance of the DNA profile in a law enforcement database.  Whether viewed as a search or a seizure, Courts have recognized that this second prong "is potentially a far greater intrusion than the initial extraction of DNA, since the [government] analyzes DNA for information and maintains DNA records indefinitely." *Nicholas*, 430 F.3d at 669-70.  Objections to this aspect of the DNA databases have been twofold. First, there is a concern that, despite precautions included in the statutes, the government or third parties would gain unauthorized access to parts of the genome other than the thirteen  "junk" loci[6] currently included in CODIS and obtain other personal information.  *See Weikert*, 504 F.3d at 12-13.  Second, some worry that scientific advances in DNA technology may someday make it possible to extract personal information other than identity from the "junk" DNA already included in the profiles.  *See id.*

(i) Diminished Privacy Interest Accorded Persons Subject To Statutory Collection

---

[6] The DNA profiles contained in CODIS consist of analyses of various alleles located at thirteen markers (or loci) along the DNA molecule. These loci are each found on so-called "junk DNA" – that is, non-genic stretches of DNA not presently recognized as being responsible for trait coding – and "were purposely selected because they are not associated with any known physical or medical characteristics." *See Kincade*, 379 F.3d at 818 (quoting H.R. Rep. No. 106-900).

A crucial underpinning of the holdings finding DNA database statutes constitutional has been the substantially diminished expectations of privacy accorded to convicted offenders. The Fourth Circuit has eloquently explained that "[w]ith the person's loss of liberty upon arrest comes the loss of at least some, if not all, rights to personal privacy otherwise protected by the Fourth Amendment. . . . Similarly, when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it." *Jones v. Murray,* 962 F.2d 302, 306 (4th Cir. 1992). It is this reduced level of privacy in their identifying information that alleviates any need for individualized suspicion before authorities may collect a DNA sample from prisoners and include it in a law enforcement database. Other cases have held that probationers, parolees, and persons on conditional or supervised release have similarly reduced expectations of privacy in their identities. *See, e.g., Amerson*, 483 F.3d at 86 ("a probationer's expectation of privacy in his or her identity is severely diminished"). Courts upholding DNA database statutes conclude that "*[i]n light of conditional releasees' substantially diminished expectations of privacy*, the minimal intrusion occasioned by blood sampling, and the overwhelming societal interests so clearly furthered by the collection of DNA information from convicted offenders, . . . compulsory DNA profiling of qualified federal offenders is reasonable under totality of the circumstances." *Kincade*, 379 F.3d at 839.

Defendant argues that while it is reasonable for the government to maintain DNA profiles of those convicted of specified offenses, it is *unreasonable* to do so for members of the general population whose expectation of privacy is undiminished. As one commentator has noted:

> [W]hile there may be little public objection to the inclusion of convicted offenders and other "suspect" classes for DNA data banking, the public may feel quite differently when it is their DNA that is subject to systematic collection. Reports of pervasive resistance to the most recent census questionnaire and to

proposals for national identification cards after the September 11, 2001 terrorist attacks, for example, suggest widely felt concerns about the government's collection of personal identification from ordinary citizens.

Joh, Reclaiming "Abandoned" DNA, at 879-80.

> (ii) Constitutionality of Retention of DNA Profiles Once Term of Supervision Expires

Further support for Defendant's position can be found in several circuit opinions expressing concern about the constitutionality of maintaining DNA profiles in these databases after an offender has completed his sentence, and in many ways regained the status – and privacy rights – of an average citizen.

In *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004) (en banc), the Ninth Circuit upheld the provision of the federal DNA Analysis Backlog Elimination Act of 2000 that required individuals convicted of certain federal crimes and who are incarcerated, or on parole, probation, or supervised release, to give a DNA sample that would be profiled at the thirteen CODIS loci and entered into a database. The plurality held that the law was constitutional under the totality of the circumstances test. *Id.* at 839. Judge Gould filed a concurring opinion that provided the necessary sixth vote to uphold the law. Judge Gould argued that the law should be upheld instead under the special needs analysis. He formulated the "special need" as deterrence of future crime by the supervised releasee by increasing the likelihood that the individual will be caught if he commits a new crime. He stated that the database is a "tool to avoid consecutive or repetitive crime on supervised release, and when such crime occurs, to let law enforcement act to return the releasee to prison custody as soon as practicable. . . . Any use of the CODIS database to solve past crimes is incidental to the special and forward-looking penalogical need that justifies the program." *Id.* at 840 (Gould, J., concurring).

However, Judge Gould stressed that, although the issue was not presented by the case before the court, once a conditional releasee is no longer on supervision, has paid his debt to society, and has left the penal system, the individual no longer has a diminished privacy interest in his DNA and/or his identify, which might require removing his profile from the CODIS database. *Id.* at 841. Both the totality of the circumstances test and the special needs test necessarily weigh the government's interest against the targeted individual's privacy interest, and the weight shifts significantly in favor of the individual when his privacy rights are undiminished by involvement with the criminal justice system. With reference to former offenders, Judge Gould noted that "[a]lthough it might seem counter-intuitive to law enforcement that a record once gleaned might be lost, there is a substantial privacy interest at stake. In a proper case where this issue is presented, we would presumably need to weigh society's benefit from retention of the DNA records of a felon against that person's right, in a classical sense, to privacy." *Id.* at 841-42.

Judge Gould worried that, even with provisions in the laws that restrict the use of and access to the stored profiles, "[i]n our age in which databases can be 'mined' in a millisecond using super-fast computers, in which extensive information can, or potentially could, be gleaned from DNA (even the 'junk' DNA currently used), and in which this data can easily be stored and shared by governments and private parties worldwide, the threat of a loss of privacy is real, even if we cannot yet discern the full scope of the problem." *Id.* at 842. Because DNA profiles are used for identification purposes, some have argued that there is no greater affront to an individual's privacy interest by the retention of DNA than there is by the retention of fingerprints, which has been done routinely for many decades. Judge Gould acknowledged this counterargument, but rejected the facility of the comparision:

Fingerprints, of course, are routinely maintained in law enforcement files once taken, and perhaps this is an arguable analogy for DNA databases. But, unlike fingerprints, DNA stores and reveals massive amounts of personal, private data about that individual, and the advance of science promises to make stored DNA only more revealing in time. Like DNA, a fingerprint identifies a person, but unlike DNA, a fingerprint says nothing about the person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct.

*Id.* at 842 n.3.

All of the arguments that Judge Gould made with regard to former offenders apply to Davis. At the time his DNA was included in the local CODIS database, Davis had never been convicted of any felony,[7] and therefore his privacy interest in his DNA and its identifying characteristics must be considered at least as strong, and probably stronger, than that of a felon who has completed his sentence. Thus, Judge Gould's concurrence in *Kincade* would seem to indicate that the balancing of interests in Davis' case should be very different from the balancing performed by courts addressing DNA database statutes that apply only to individuals with diminished expectations of privacy.

In *Weikert*, the Second Circuit expressed agreement with Judge Gould's concurrence in *Kincade*.  Because Weikert was on conditional release when his DNA sample was taken, and therefore the issue was not squarely before it, the court "express[ed] no opinion on the constitutionality of the retention and searching by the government of the DNA profiles of individuals who have completed their terms of conditional release, which is its standard practice." *Weikert*, 504 F.3d at 15. However, it stressed that "[t]he distinction in status between a current and a former

---

[7] Davis' Presentence Report indicates that his only prior conviction was for possession of a controlled dangerous substance in the District Court for Montgomery County, Maryland in 1990. This offense appears to be a misdemeanor.  Davis was sentenced to one year of probation, suspended, and a fine.

offender clearly translates to a change in the policy interests at stake. A former conditional releasee's increased expectation of privacy warrants a separate balancing of that privacy interest against the government's interest in retaining his profile in CODIS." *Id.* at 16.   Furthermore, echoing Judge Gould's concerns, the court postulated that a separate and independent balancing of privacy interests would be warranted in the context of former offenders because the "ongoing evolution in our understanding of DNA warrants particular caution in determining what is constitutionally permissible." *Id.*  Although the former offender's profile was lawfully obtained by the government, the court was "hesitant to say that an individual has no continued expectation of privacy in a DNA profile when our understanding of the information that such a profile contains is necessarily incomplete." *Id.* at 17.

This continuum of privacy interests was also recognized in a concurring opinion by Judge Easterbrook in *Green v. Berge*, 354 F.3d 675, 679-81 (7th Cir. 2004).   There, Judge Easterbrook opined that there are four distinct categories of persons to whom DNA database laws might apply: prisoners, persons on conditional release, felons whose terms of conditional release have expired, and those who have never been convicted of a felony. *Id.*   Unlike Judge Gould or the *Weikert* court, Judge Easterbrook postulated that retention of DNA from convicted felons after their supervision is concluded *could* potentially be justified because "[e]stablished criminality may be the basis of legal obligations that differ from those of the general population," such as sex offender registration statutes like Megan's Law. *Id.* at 680.   However, he went on to say that

> What is "reasonable" under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population. Just as parolees' homes may be searched without a warrant or probable cause, while both are required to search a free person's home, so it may be that collection of DNA samples from the general population would require person-specific cause – or at least a "special need" . . .

*Id.* at 680.  Though Judge Easterbrook might reach a different conclusion than Judge Gould with regard to the retention of DNA profiles of former offenders, simply by drawing the distinction, he underscores the point that the constitutionality of DNA analysis should be evaluated separately with regard to each group.

(iii) Expungement Provisions in Maryland and Federal DNA Database Statutes

Davis also argues that the expungement provisions in both the Maryland and federal DNA indexing statutes support his contention that his profile never should have been placed in the local CODIS database.  Both laws require that an individual's DNA record be expunged from the database if the defendant is never convicted, his conviction is reversed or vacated, or the charges are dismissed.  *See* 42 U.S.C. §§ 14132(d)(1)(A)(i) - (ii); 42 U.S.C. §§ 14132(d)(2)(A)(i) - (ii); Md. Code Ann. Pub. Safety § 2-511.  Since Davis was never arrested or charged for the Neal murder, he argues that the Government had even less cause, and no statutory authority, to retain his DNA in a database. The expungement provisions do not directly apply to Davis' situation because they are drafted specifically to address circumstances in which an individual's DNA was placed in the database on the basis of a conviction or arrest. *See, e.g.,* 42 U.S.C. §§ 14132(d)(1)(A)(i) - (ii). Therefore, although the Government was under no legal obligation to remove Davis' DNA from the database, the construction of the statute strongly suggests that Congress and the Maryland legislature respected the privacy interests of those individuals never convicted for qualifying offenses, and did not intend for ordinary citizens' or victims' DNA to be included in the database.

The Government argues that, to the contrary, the structure of the statutes actually supports the inclusion of Davis' profile in the database because analyses of DNA samples recovered from crime scenes are specifically enumerated among the types of records to be included in the index. *See*

42 U.S.C. § 14132(a)(2); Md. Code Ann. Pub. Safety § 2-505 ("To the extent possible DNA samples shall be collected and tested . . .as part of an official investigation into a crime . . ."). However, when read in conjunction with the expungement provisions of those statutes, the Court believes that this statutory language was intended to apply to DNA samples that may have come from the as-yet-unknown perpetrator of a crime in order to potentially identify a suspect,[8] rather than known samples from the victim.

To find that these laws support and encourage the retention of DNA samples from victims of crimes would be in conflict with the other provisions of those statutes that narrowly limit the population of individuals who are subject to the laws. For example, in addition to the expungement provision, the federal statute specifies that "DNA samples that are voluntarily submitted solely for elimination purposes shall not be included in the National DNA Index System." 42 U.S.C. § 14132(A)(1)(C). Thus, if Davis had voluntarily submitted a blood sample to exonerate himself in the Neal murder, his DNA profile could not have then been entered into the database. Furthermore, to the extent the Government attempts to rely on Section 2-505 of the Public Safety Article of the Maryland Code to support the placement of Davis' DNA into CODIS, its argument is defeated by Section 2-504(a)(3)(iii), which provides that:

> DNA evidence collected from a crime scene or collected as evidence of sexual assault at a hospital that a law enforcement investigator considers relevant to the identification or exoneration of a suspect shall be tested as soon as reasonably possible following the collection of that sample.

So, if the Government is arguing that Davis' DNA was properly placed in the database as part of the investigation into his shooting in 2000, the evidence was clearly not tested promptly. Md.

---

[8] Indeed, this was how the database was utilized in connection with the investigation into the Schwindler murder, which led to the identification of Davis as a suspect.

Code Ann. Pub. Safety § 2-504(a)(3)(iii).  Alternately, if it is arguing that Davis' DNA was part of the official investigation into the Neal murder, then it would be subject to Maryland's automatic expungement provision because Davis was never convicted (nor charged) with that crime. *See* Md. Code Ann. Pub. Safety § 2-505(a)(1)(i) ("any DNA samples and records generated as part of a criminal investigation or prosecution shall be destroyed or expunged *automatically* from the State DNA data base if . . . a criminal action begun against the individual relating to the crime does not result in a conviction . . . .").

The Court therefore finds that, as a whole, both the federal and Maryland DNA indexing statutes support the conclusion that Davis retained a significant privacy interest in his DNA profile. It will now proceed to weigh that interest against the legitimate governmental interests served by the retention of his profile.

   *b) Governmental Interests*

The courts addressing the Fourth Amendment compliance of DNA database statutes have not all agreed on the precise formulation of the governmental interests at stake, but they are clearly different than the interests presented by the case *sub judice*.  The mandatory DNA sampling from convicted offenders is a *suspicionless* search, and not undertaken in furtherance of the investigation of any specific crime or to connect the individual sampled to any individual past offense.  A number of courts interpret the legitimate governmental interest as maintaining an enduring and accurate method of identification of prisoners or former offenders.  *See, e.g., Weikert*, 504 F.3d at 13 (government has "'overwhelming interest' in maintaining a record of the identities of such individuals because they 'are more likely to commit future criminal offenses than are average citizens'") (quoting *Penn. Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 365 (1998)); *State v.*

*Raines*, 857 A.2d 19, 33 (Md. 2004) (DNA profiles collected pursuant to the Maryland statute "thus serve[] the purpose of increasing the efficiency and accuracy in identifying individuals within a certain class of convicted criminals. . . [and are] totally distinguishable from search of ordinary individuals for the purpose of gathering evidence against them in order to prosecute them for the very crimes that the search reveals").

Other courts identify an important government interest in "combating and deterring felony recidivism." *Jones v. Murray,* 962 F.2d 302, 311 (4th Cir. 1992); *see also Kincade*, 379 F.3d at 840 (Gould, J., concurring). Still other courts rely on an interest in creating a tool that will assist in solving *future* crimes should the investigation of such crimes utilize DNA testing of evidence. *See Nicholas*, 430 F.3d at 668.

With the exception of the last, these interests are not at play in the instant case. As of 2004, Davis was neither a prisoner nor a convicted felon, so the government could not assert a heightened interest in maintaining a record of his identity. Nor could the government point to a need to deter recidivism. First, Davis had not yet been convicted of a felony, and second, he was not aware that his DNA profile was being placed in a database, so that fact could not possibly have any deterrent effect on his behavior.

Importantly, in reaching their conclusions that the governmental interests outweighed the individuals' privacy interests such that the searches were reasonable under the Fourth Amendment, many courts stressed that the laws were applied evenly to a large group of persons, and left no discretion to law enforcement officials that potentially could be abused. *See, e.g., Weikert*, 504 F.3d at 14 ("the importance of the government's interests is not diluted by the possibility of selective enforcement or harassment"); *State v. McKinney*, 730 N.W.2d 74, 86 (Neb. 2007) ("DNA databasing

49

statutes do not allow law enforcement to single out any particular offender").

As the Second Circuit has cogently explained:

> The usual purpose of obtaining a warrant – to permit the state to engage in the normal law-enforcement function of crime investigation – is absent in the context of an information-gathering search.  And the concerns that usually animate the warrant requirement – *that the state will exercise its search and seizure powers arbitrarily* – are not at play in the case of DNA-indexing statutes, which take a blanket approach and apply to all convicted offenders falling within certain categories.

*Nicholas v. Goord*, 430 F.3d at 671-72 (emphasis added).  It later elaborated in *Amerson* that

> the programmatic nature of the 2004 DNA Act-all felons are required to submit DNA samples, and the uses of those samples are strictly circumscribed - *leaves no discretion for law enforcement personnel* to decide whether to force an individual to submit to a taking of a DNA sample or how to use the information collected.  This lack of discretion removes a significant reason for warrants-to provide a check on the arbitrary use of government power.

*Amerson*, 483 F.3d at 82 (emphasis added).

In this case, these safeguards were absent, reducing the strength of the government's interest.  The choices to test Davis' clothing for DNA, and afterwards to place his DNA profile in the local CODIS database, were left entirely to the discretion of individual police officers or police departments. Unlike prisoners uniformly subject to a DNA indexing statute, Davis was vulnerable to being selectively targeted, based on some unknown level of suspicion that was never evaluated by a neutral magistrate, simply because at some point in the past, police had serendipitously come into possession of his blood after he sought hospital treatment for a gunshot wound.  In upholding the Maryland DNA Act, the Court of Appeals of Maryland stressed that "the Act does not seek to obtain evidence, but merely to identify persons." *State v. Raines*, 857 A.2d 19 (Md. 2004).  Here, the government's interests are precisely the opposite. Davis had already been identified, and Prince George's County police detectives sought to obtain evidence against him.  This level of unchecked

discretion leaves open the possibility that police could place DNA profiles in the database arbitrarily, or on a basis unintended by the statutes.

Thus, the only legitimate governmental interest that this Court can identify that was furthered by the placement of Davis' DNA profile into the database was the general law enforcement interest in solving future crimes.  The Court does not mean to belittle this interest – DNA databases are a great asset to law enforcement, and in fact were directly responsible for bringing Davis to justice in the instant case. As the Court of Special Appeals of Maryland has said, "[t]he development of such a new and scientifically reliable investigative tool should give rise, in any sane society, not to a cry of alarm but to a sigh of relief." *Wilson v. State*, 752 A.2d 1250, 1272 (Md. Ct. Sp. App. 2000). However, the ends cannot automatically justify the means.

> It must be conceded that a DNA database may be, indeed, already has demonstrated that it may be a valuable tool for solving crimes that otherwise would be difficult of solution or would not be solved and could be a boon to those falsely accused, by exonerating them, as it has been to some already. That does not, however, answer the constitutional question. Undoubtedly, there are many crime fighting tools that, if allowed to be used, without restraint or with minimal oversight and unrestrained by the Fourth Amendment, would prove quite effective in detecting and solving crime, yet would wreak havoc with constitutional rights, even of inmates. It is for that reason that throughout the history of the Fourth Amendment, considerable efforts have been made to strike a balance between the State's law enforcement goals and the constitutional rights of the individual citizen. Surely the framers wanted law enforcement to operate in an effective and efficient manner; however, they were wise enough not to adopt a "by any means necessary" stance.

*State v. Raines*, 857 A.2d 19, 64 (Md. 2004) (Bell, C.J., dissenting).

### c) Conclusion As To Placement of Davis' Profile In Database

The above analysis demonstrates that there are significant privacy interests implicated by the maintenance of one's DNA profile in a government database, above and beyond those implicated by the testing and comparison of one's DNA profile to evidence from a single, specific crime.  Were

law enforcement permitted to include individuals' DNA profiles in searchable databases under these circumstances, it would open "a backdoor to population-wide data banking."  Joh, Reclaiming "Abandoned" DNA at 874.   If the Fourth Amendment imposes no restrictions on the indefinite retention of DNA profiles developed from "abandoned" DNA or DNA lawfully in police possession for another purpose, then "the means by which total population DNA data banking might be achieved have arrived without general public awareness and thus without discussion of how it might be regulated against abuse." Id. at 884.

Although we may eventually retain DNA profiles as routinely as we retain fingerprints today, the Court does not believe that day has yet arrived:

> Since investigators should not treat ordinary private citizens like criminals, the analysis should differ and courts should consider additional factors. Similar to the case of convicted criminals, obtaining the DNA of ordinary citizens through covert methods is not overly invasive. Unlike convicted criminals, however, an ordinary citizen, solely by virtue of police suspicion, does not have an increased tendency to commit crimes. If the covertly obtained DNA profile of an ordinary citizen is included in a database, authorities have the capabilities to identify a near hit, which might indicate that he or she is a close relative to the perpetrator of a crime. Furthermore, DNA has the potential to reveal a wide range of personal information, including physical characteristics, medical information (such as susceptibility to disease), ancestral and familial information.[9] Practically speaking, police could not obtain these kinds of private information without a search warrant or without first having gained the trust and confidence of the individual.

Matejik, DNA Sampling at 85.

Given Davis' elevated privacy interest as compared with convicted offenders, and the

---

[9] It is this potential for the disclosure of a vast amount of intensely personal information that makes DNA databases of greater privacy concern than fingerprint databases, which can *only* provide identification.  *See, e.g., State v. Raines*, 857 A.2d 19, 62 (Md. 2004) (Bell, C.J., dissenting) (rejecting the proposition that a DNA analysis amounts to a simple identification technique akin to fingerprinting because of the "vast amount of personal and private information DNA contains").

government's comparatively weaker interests as compared to those served by the programmatic DNA indexing pursuant to statute, the Court concludes that on the rather unique facts of this case, the inclusion of the Defendant's DNA profile in the local CODIS database may not be considered reasonable under the Fourth Amendment. The generalized interest in crime control cannot overcome Davis' continuing privacy interest in his DNA profile, which was placed in a database without a warrant and unsupported by either the federal or Maryland DNA database statutes.

Although the actions of the officers in this case hardly shock the conscience, and may even seem logical and prudent to some, this does not mean that a constitutional violation has not occurred. Justice Stewart, dissenting in *Edwards*, stated that "[t]he intrusion here is hardly a shocking one, and it cannot be said that the police acted in bad faith. The Fourth Amendment, however, was not designed to apply only to situations where the intrusion is massive and the violation of privacy shockingly flagrant." *Edwards*, 415 U.S. at 812 (Stewart, J., dissenting).  Justice Stewart urged courts to be vigilant in their protection of Fourth Amendment interests:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty to courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Id.* at 812-13 (quoting *Boyd v. United States*, 116 U.S. 616 (1886)).

### D. Application of the Exclusionary Rule Is Not Appropriate In This Case

Davis argues that because his profile was placed in the Prince George's County database in violation of the Fourth Amendment, the Court must exclude all evidence flowing from that act,

namely the "hit" between his profile and the evidence left at the scene of the Schwindler murder. But for the constitutional violation, he argues, police never would have obtained the DNA evidence against him, and therefore the evidence must be suppressed as fruit of the poisonous tree.

The Fourth Amendment contains no provision explicitly precluding the use of evidence obtained in violation of its commands. *Arizona v. Evans*, 514 U.S. 1, 10 (1995). Supreme Court decisions, however, have established an exclusionary rule that, when applicable, forbids the use of illegally obtained evidence at trial. *See, e.g., Weeks v. United States*, 232 U.S. 383 (1914). This judicially-created rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 129 S. Ct. 695, 699 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Thus, the fact that a Fourth Amendment violation may have occurred does not necessarily mean that the evidence will be inadmissible. Instead, the question of suppression will turn on the culpability of the police action and the degree to which exclusion of the evidence will deter future police misconduct. *Herring*, 129 S. Ct. at 698.

The so-called "good faith" exception to the exclusionary rule was first recognized in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Court held that the exclusionary rule does not apply when police act in objectively reasonable reliance upon a warrant that is later invalidated for lack of probable cause. *Id.* at 922. Three years later, in *Illinois v. Krull*, the Court extended this doctrine to warrantless administrative searches performed in good-faith reliance on a statute that was later declared unconstitutional. 480 U.S. 340 (1987). Subsequently, in *Arizona v. Evans*, the Court applied the rule to police who reasonably relied on misinformation in a court's database that an arrest warrant was outstanding, reasoning that a clerical error by a judicial employee could not be the basis for excluding evidence, in large part because there was no basis for the Court to conclude

that application of the exclusionary rule in those circumstances would have any significant effect on deterring those types of errors in the future. *See* 514 U.S. at 15.

Finally, earlier this year in *Herring v. United States*, the Court resolved one of the outstanding questions regarding the good faith rule: Whether evidence should be suppressed if police personnel, as opposed to legislative or judicial actors, are responsible for the error upon which other police relied. 129 S. Ct. at 698. *Herring* involved a factual scenario similar to that in *Evans*. In both cases, an arrest and search were made pursuant to information retrieved from a database indicating that an individual had an outstanding warrant for his arrest.  In both cases, this information was erroneous. The crucial difference was that in *Evans,* the computer records were maintained by the justice court clerk's office, whereas in *Herring*, the records were maintained by the sheriff's department in a neighboring county.  Herring was arrested by a Coffee County, Alabama police officer based on information received from the warrant clerk in nearby Dale County that there was an outstanding warrant for his arrest for failure to appear on a felony charge.  *Id.* at 698. Within ten or fifteen minutes however, the Dale County warrant clerk realized that there had been an error in the sheriff's department's record keeping, and that Herring's warrant had been recalled five months earlier. By that time, however, Herring had already been arrested by the Coffee County officers and found with a gun and drugs that were the basis of his subsequent motion to suppress. *Id.*

The Court stressed that "suppression is not an automatic consequence of a Fourth Amendment violation.  Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Id.* at 698.  In *Leon*, the Court stated clearly that "an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus" of applying the exclusionary rule. *Leon*, 468 U.S. at 911.  It further elaborated in *Krull* that evidence

should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Krull*, 480 U.S. at 348-49.  Mindful of *Leon*'s admonition that when applying the good faith rule, courts must consider the actions of all the police officers involved,[10] the Court found that the Coffee County police officers did nothing wrong, and the error by the Dale County sheriff's department was negligent, but not reckless or deliberate.  *Herring*, 129 S. Ct. at 700.

In addition, any deterrent benefits achieved by exclusion of evidence must outweigh the costs to the justice system.  "The principal cost of applying the rule, is, of course, letting guilty and possibly dangerous defendants go free – something that 'offends basic concepts of the criminal justice system.'" *Id.* at 701 (quoting *Leon*, 468 U.S. at 908).  "[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Id.* (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998)).  After balancing the interest in deterrence against the costs, the Court in *Herring* concluded:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level.

*Id.* at 702.  As a point of comparison, the Court noted that the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently and flagrantly unconstitutional. *See*

---

[10] "It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination.  Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search." *Leon*, 468 U.S. at 922 n.24.

*Weeks*, 232 U.S. 383 (officers broke into defendant's home to confiscate incriminating papers, returning later to seize more items, and Court found that police were so lacking in individualized suspicion, a search warrant would not have been justified); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) (federal officials "without a shadow of authority" went to defendant's office and made a "clean sweep" of every paper they could find); *Mapp v. Ohio*, 367 U.S. 643 (1961) (officers forced open door to defendant's home, prevented her lawyer from entering, brandished false warrant, and searched home for obscenity).

In this case, the only constitutional violation occurred when Prince George's County homicide detectives, after comparing Davis' DNA profile with the sample from the Neal homicide, retained Davis' profile in the local CODIS database.  As the length and intricacy of this Court's analysis of that decision should indicate, whatever error existed was hardly flagrant. Given precedents such as *Edwards*, the officers most likely believed that Davis had no significant privacy interest in his clothing because it was lawfully within police custody. Then, once the profile existed, the officers placed it within the database for use in any potential future investigations; it is certainly counterintuitive that information, once gained by police, should not be retained. However, in the unique discipline of DNA analysis, as the Court's analysis above demonstrates, this is what the Fourth Amendment requires.  Nonetheless, the placement of Davis' profile in the database can hardly be called reckless, flagrant, or systematic, and is negligent at worst.

The actions of the officers investigating the Schwindler murder are even less culpable. When those officers realized that the culprits in the Schwindler robbery/murder had left DNA evidence behind, detectives simply utilized an investigative resource that was available to them.  They ran a comparison of the crime scene evidence against the profiles contained in the local CODIS database

and came up with a "hit."  This is precisely why such databases were created - to assist in solving crimes where more traditional investigative techniques may not be successful.  The detectives investigating the Schwindler murder had no knowledge of the circumstances under which Davis' DNA came to be included in the database, nor were they under any obligation to make inquiries about them. Officers are entitled to rely upon the presumptive legality of any DNA profile contained within their database.  Therefore, as to these detectives, there is no behavior that needs to be deterred by application of the exclusionary rule.

As for the officers who placed Davis' profile in the database, the Court finds that excluding the DNA evidence in this case would result in only marginal deterrence, if any. First of all, the relative rarity of the factual scenario presented here – a former victim's DNA already being in police custody when that victim later becomes a suspect – does not create a great need to deter similar actions in the future.  Errors that arise from "nonrecurring and attenuated negligence [are] far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place." *Herring*, 129 S. Ct. at 702.  Furthermore, the good faith rule does not require that exclusion of the evidence have no deterrent effect whatsoever.  As the Court noted in *Herring*, "we do not suggest that the exclusion of this evidence could have *no* deterrent effect. But our cases require any deterrence to 'be weighed against the substantial social costs exacted by the exclusionary rule,' and here exclusion is not worth the cost." *Id.* at 702 n.4 (quoting *Illinois v. Krull*, 480 U.S. at 352-353 (internal quotation and citations omitted)) (emphasis added).

This Court reaches the same conclusion in the instant case. Any deterrent effect that could be achieved by application of the exclusionary rule in this case would be vastly outweighed by the costs that would be incurred by suppression of the powerfully inculpatory and reliable DNA

evidence.  The marginal deterrence that might be achieved by suppression of the evidence in this case – potentially preventing police from placing DNA profiles obtained from those with undiminished privacy expectations in their genetic information (already a rare occurrence) into law enforcement databases – simply cannot justify keeping the DNA evidence from the jury and disrupting the truth-seeking function of a criminal trial.

### III. CONCLUSION

The seizure, nine years ago, of Defendant's blood-stained clothing, the later extraction of DNA therefrom, and the entry of his DNA profile into the local CODIS database has generated a host of interesting and novel legal issues that have now been addressed and resolved.  Ultimately, any Fourth Amendment violations were, at worst, close calls over which many reasonable minds could differ.  There was certainly no blatant or flagrant police action in deliberate disregard of the Defendant's rights that would warrant the remedy of suppression.

Accordingly, the Court will, by separate order, deny the Defendant's motion.


Date: September 15, 2009                                    /s/
                                            ROGER W. TITUS
                                            UNITED STATES DISTRICT JUDGE